**Walter M. BALLARD**

v.

**The TINGUE MILLS, Inc.**

**Civ. No. 3741.**

United States District Court,
D. Connecticut.

Dec. 9, 1954.

Charles Weingarten, Bridgeport, Conn., for plaintiff.

Pouzzner, Hadden, Kopkind & Hadden, William L. Hadden, New Haven, Conn., Joseph N. Perelmutter, Seymour, Conn., for defendant.

HINCKS, Circuit Judge.

## The Parties

1. The defendant is a Connecticut Corporation which, from about 1940 to the present, has been operating a textile mill at Seymour, Connecticut, and a sales office in New York City. From 1940 until the present time Floyd del Brown has been the President and Director of defendant corporation.

2. The plaintiff, Walter M. Ballard, for many years prior to 1948 had maintained an agency in Washington, D. C., which has represented some private commercial firms with respect to obtaining contracts with the United States Government.

3. In the early part of 1948, Victor Chenea was hired by the defendant to help obtain business for the defendant. Chenea was elected Vice-President of the defendant corporation and was made sales manager. His compensation was 25% of the net profit of any business obtained by him with a drawing account of $200 weekly, not to exceed $8,500 per annum, against said commission. In December 1948, Chenea became plant superintendent of the defendant corporation at a weekly salary of $200. Chenea is not now and has never been a stockholder or director of the defendant corporation. Chenea left the employ of the defendant corporation in August, 1950.

His deposition for purposes of the instant action was taken on December 22, 1952, in Miami, Florida. At that time he had no interest whatever in the defendant corporation.

4. On April 22, 1948, the defendant corporation was doing very little, if any, business. It was practically shut down. On that date, with the knowledge and consent of Brown, Chenea visited the plaintiff's offices in Washington, D. C. Chenea wanted to know if the plaintiff and his organization could aid the defendant corporation in obtaining Government contracts. The plaintiff told him that he thought that favorable results could be obtained with the Government.

## The Contract.

5. At this meeting of April 22, 1948, Chenea repeatedly informed the plaintiff that he did not have the authority to enter into a final agreement with the plaintiff. He said that a written contract was necessary. He stated that he would carry any proposal back to Mr. Brown for his approval. The proposal, or tentative agreement, orally made by the plaintiff and relayed by Chenea to Brown included the following: that the plaintiff was to be the exclusive representative of the defendant to obtain Government contracts, and a non-exclusive representative of the defendant to obtain contracts with commercial or private parties and that the plaintiff should receive commissions of 5% on the purchase price of sales received by the defendant on all such contracts as should be made through the plaintiff's aid. This tentative agreement was to be terminable at will by either party on notice, but the "aid" which the plaintiff was to provide was not at all specified. The testimony is very unclear as to whether the tentative agreement as formulated in the April meeting was to include (1) Government contracts obtained through competitive bidding as well as negotiated contracts with the Government, and (2) Government contracts emanating from procurement agencies outside of Washington, D. C. However, the evidence as

a whole and particularly the evidence as to the subsequent conduct of the parties warrants an inference in favor of the plaintiff as to these two points. I find, therefore, that the tentative agreement was of such scope as to include Government contracts, from whatever procurement agency they emanated, including such contracts as should be awarded on competitive bids.

6. Before Chenea left the April 22, 1948 meeting with the plaintiff he gave the plaintiff samples from the defendant's mill. He also left the plaintiff with certain letterheads of the defendant corporation and promised to send the plaintiff, after receiving the approval of Brown, a facility report of the defendant's mill. Chenea also requested that the plaintiff begin work immediately which the plaintiff did. Mr. Chenea, upon his return from Washington, fully informed Mr. Brown of the proposal as stated above. Mr. Brown said that he would handle the matter.

7. On May 3, 1948, Chenea, with the knowledge and consent of Brown, sent a facility report to the plaintiff. Subsequently, he sent certain alpaca lining samples to the plaintiff.

8. The proposed agreement was never reduced to writing. Mr. Brown and Mr. Ballard have been friends for a long period of time and were at the time here involved business associates in another venture. All correspondence between the plaintiff and the defendant was directed to Mr. Chenea. The plaintiff never directly called Mr. Brown's attention to the matter though they were frequently in each other's company. The plaintiff in several instances informed Mr. Chenea that the Government had requirements for products such as the defendant could manufacture for which defendant could submit bids. This information was brought to Mr. Brown's attention by Mr. Chenea. Though Brown knew of the plaintiff's activities in his behalf, he never expressly approved or disapproved of the tentative agreement which emerged from the April 22, 1948 meeting until October 17, 1951,

when he refused to pay the plaintiff any commissions on the two contracts described in Finding 9 which the defendant corporation had received from the United States Government between 1948 and 1951.

9. There are two contracts in issue in this case. The defendant corporation on July 6, 1948 submitted a bid at the Army Quartermaster's Office in New York City for a contract to supply pile cloth material. As a result of this bid the defendant was awarded a contract to supply the Army with 200,000 yards of said material at $5.55 a yard. This contract was completed by delivery by the defendant of 197,000 yards, for which it received by April, 1949, the purchase price of about $1,093,350. On August 24, 1950, the defendant corporation was awarded, after submitting a bid, a contract for 225,000 yards of pile fabric at $5.60 per yard, at an aggregate price of $1,318,518. This contract also was made with the Army Quartermaster's Office in New York City. This contract was completed and the purchase price was received by the defendant by December, 1950. Each of the above contracts were awarded on the basis of competitive bidding open to the public. The aggregate commissions computed on these payments amounted to about $120,593.40.

10. On May 18, 1948, the plaintiff wrote a letter to Mr. Chenea informing the latter that within 60 to 90 days the Army Quartermaster's Office in New York City would send invitations to bid for contracts to supply material which the defendant corporation was equipped to produce. The letter included the name of the Army Officer in Charge and where his office was located. On May 20, 1948, Chenea sent a letter to the plaintiff saying that "you are very much on the job" and "I appreciate the prompt and efficient way you are handling these things * * *." On June 19, 1948, the plaintiff wrote Mr. Chenea and stated the following:

"Certainly hope you will be able to put in the successful bid on the

375,000 yards, 54″ pile wool cloth, Proposal Invitation No. 18, opening on July 6th in the New York Quartermaster Purchasing Office about which we also talked on the phone and please be sure to have your office send us a copy of this bid which we understand will include a 5% sales commission for this office as per our discussion."

Mr. Brown was aware of this correspondence, but the defendant corporation did not answer the plaintiff as·to the 5% commission until December 27, 1948, when Chenea, in a letter to the plaintiff, indicated that the defendant did not believe that the plaintiff was entitled to any compensation in relation to the first contract referred to in Finding 9, saying:

"As you probably know, Floyd Brown contacted some of his old friends in the Quartermaster's Division at 16th Street and through them has succeeded in getting this present order we are now working on. Apparently his connection is very good and they are keeping us posted on everything coming out and I believe we can, without much trouble, get sufficient orders to keep our plant going for the next year or so."

To this the plaintiff replied by letter dated January 28, 1949,

"* * * We are certainly glad to hear that you anticipate a volume of business in the Quartermaster's Division * * * in New York City and quite naturally we are pleased to know that our letter of last May 18th contained information which opened up this source of business."

The above quoted letter from the defendant in no way referred to plaintiff's letter of May 18.

11. The letter of May 18, 1948, and the letter of June 19, 1948, referred to in Finding No. 10, and certain telephone calls to Chenea covered in the letters, constituted the plaintiff's sole claimed contribution to the award of the first contract. The plaintiff in no way aided in the preparation or presentation of the bid for said contract. Nor did the letter of May 18 supply the defendant with information as to specifications or the amount of fabric that would be required.

12. The defendant subscribed to a daily trade paper in the textile business which contained the market price of materials, and information concerning contracts which were being advertised for bid. On June 8, 1948, Brown read a Government notice relating to bids for the first contract (see Finding 9) in said journal which gave him the same information as is contained in defendant's letter of June 19 referred to in Finding No. 10.

13. On March 1, 1949, the plaintiff sent the following letter to Mr. Chenea:

"Confirming telephone conversation of today, please get in touch with Major Gerold S. Nash in the Office of Colonel Lester O. Grice * * * 111 East 16th St., New York City. As I explained to you, proposals are out for a very large quantity of 56 inch velour wool cloth. Proposal No. 1012, opening March 9th, 1949. We hope you will be able to bid on this requirement and make a serious effort to land the contract. Please include in your price, if you bid, the usual 5% sales fee for this office."

Chenea replied by letter of March 9, 1949, stating that the above material was not a pile fabric and that the Chief Procurement Officer in the New York City Quartermaster's Office would notify the defendant of any bidding on contracts for pile fabrics. Beyond his letter of March 1, 1949, the plaintiff gave the defendant no aid in obtaining the second contract described in Finding No. 9. Subsequent to the letter of March 1, 1949, the plaintiff was able to obtain the same information as was contained in that letter from Trade Journals and from the Quartermaster's Office in New York City. Nothing in the letter of March 1, 1949, informed the defendant of the detailed specifications or the pre-

cise amount of material that the government would require.

14. Both of the contracts in question contained warranties by the defendant that no contingent fees were involved and the defendant in its bids for said contracts included no allowance for 5% commissions to the plaintiff.

15. On October 9, 1951, the plaintiff sent a letter to Mr. Brown demanding a 5% commission on each of the two contracts referred to above. On October 17, 1951, Brown wrote the plaintiff and wholly denied the existence of any agreement with the plaintiff for said commissions.

16. From the course of conduct of the parties as found above and particularly from the defendant's conduct in providing the plaintiff with the facility report as found in Finding No. 7, I find that the defendant intended to accept the plaintiff's proposal as defined in Finding 5. It intended to accept a proposal under which the plaintiff would be entitled to compensation only if his services aided, i. e., were the effective cause, in procuring contracts.

17. The plaintiff, as to the contracts under which he here seeks compensation, did nothing which aided the defendant in obtaining said contracts and was not the effective cause thereof.

### Illegality of the Contract.

18. The agency agreement was exclusive, by the plaintiff's own admission, only in so far as Government contracts were concerned. It was a non-exclusive agency in procuring contracts with private commercial firms. The proposal did not contemplate that the plaintiff would attempt to obtain any specific contract with the Government.

19. During the Second World War and up until 1946, the defendant corporation did some work for the federal government. Since that time the defendant corporation has had no Government contracts other than those involved in the instant action.

20. So far as the evidence shows, prior to its contract with the plaintiff the defendant, although employing sales agents generally to drum up business on a commission basis, never employed a sales agent or a sales representative under an exclusive agency to obtain Government contracts.

### Conclusions of Law.

1. The court has jurisdiction of the parties and the subject matter.

2. The plaintiff offered his services to aid defendant to obtain Government contracts: the defendant accepted said offer and promised to pay the plaintiff a 5% commission on contracts of the making of which the plaintiff's services were the effective cause.

3. By appointing the plaintiff as its exclusive representative to obtain Government contracts, the defendant was not precluded from obtaining such contracts through its own efforts nor under obligation to pay the plaintiff commissions on contracts so obtained.

4. For lack of proof that the services for which the plaintiff seeks compensation were the effective cause of the two contracts here involved, the complaint should be dismissed.

5. Executive Order 9001, 50 U.S.C.A. Appendix, § 611 note, is applicable to the agency contract on which this action is based and the plaintiff has failed to prove that as the promisee under the contract he falls within the exception stated in said Order.

6. The contract between the parties on which the action is based is unenforceable because in contravention of public policy.

7. The complaint should be dismissed because the contract upon which it is based is unenforceable.

The Clerk will enter forthwith a judgment of dismissal with costs to the defendant.

### Opinion.

The plaintiff seeks commissions aggregating upwards of $120,000, on two contracts between the United States Government and the defendant: one for 200,000 yards of pile cloth material at

$5.55 a yard and another for 225,000 yards of pile fabric at $5.60 per yard.[1] His claim is based on an alleged oral agreement between the plaintiff and the defendant growing out of a meeting on April 22, 1948, between the plaintiff and defendant's vice-president, one Victor Chenea, in the former's office in Washington, D. C., sought by the latter to discuss the possibility of obtaining contracts with the United States Government to be filled by the defendant's textile mill in Seymour, Connecticut. The plaintiff contends that from this meeting a binding oral agreement emerged containing the following provisions: (1) that the plaintiff would be the exclusive representative of the defendant to obtain contracts, both negotiated and competitive bid contracts, with the United States Government, including those emanating from procurement agencies established anywhere in the United States; (2) that on all contracts which the defendant should make and perform with the aid of the plaintiff's services, the plaintiff would become entitled to a 5% commission on the total purchase price received by the defendant; and (3) that the agreement was terminable at will at any time by either party.

The defendant denies the existence of any agreement with the plaintiff on the ground that Chenea had no authority to bind it; it contends that even if there was such an agreement it is unenforceable because its terms were against public policy; and that, even if the contract was enforceable, the plaintiff cannot recover because he was not the procuring cause of the contracts in question.

Some of the issues raised present solid questions of fact concerning which there is much conflicting testimony. Chenea gave his testimony by deposition at a time when he was no longer associated with the defendant corporation and had no financial interest in the outcome of the case. His testimony on many points is not clear. On other points, however, it is definite, emphatic and convincingly honest. I accept it as true. He testified that at the time of his Washington meeting with the plaintiff he repeatedly told the plaintiff that he had no authority to bind the defendant corporation; and that anything agreed upon at the meeting was necessarily tentative pending the approval of Floyd del Brown, President of the defendant corporation. Chenea also then told the plaintiff that the tentative agreement reached at that time would be binding only if subsequently confirmed in writing by Brown. From his testimony, I am convinced that the agreement reached at that time was not binding on the parties despite the fact that Chenea then requested the plaintiff to commence work immediately which was done. The "agreement" was no more than an offer by the plaintiff and until the offer was accepted, the plaintiff worked in the defendant's behalf at the risk of never being compensated.

■ Chenea carried the proposal back to Brown. Brown never expressly, either orally or in writing, approved or disapproved the proposal. Still he did authorize Chenea, almost immediately after his return from Washington, to send a facility report of the mill to the plaintiff. Thereafter the plaintiff communicated frequently with Chenea as to possible contracts, and Chenea encouraged him in his endeavors. The defendant was fully aware of the plaintiff's activities in its behalf and of his vice-president's response to those activities. Silence and inaction in certain circumstances can operate as an acceptance of an offer, as, for instance, "Where the offeree with reasonable opportunity to reject offered services takes the benefit of them under circumstances which would indicate to a reasonable man that they were offered with the expectation of compensation." See Vol. 1, Restatement of the Law of Contracts, 372(b).

■ Perhaps the plaintiff had no right to rely on Brown's mere silence and acquiescence in view of his knowl-

---

[1]. Jurisdiction in this case is based on diversity of citizenship and the amount in controversy.

edge that a written contract was required. But the plaintiff relied on more than Brown's inaction; he relied on the direct action of Chenea after the latter's return from Washington. By that direct action I think that the plaintiff could justifiably believe that the necessity of a written contract had been dispensed with. Hence I hold that a contract was made, the scope of which was stated in Finding 5 and under which the defendant was liable to pay the plaintiff the stipulated commission in return for services, not specifically stated, which the plaintiff was to render.

But what were the services for which the defendant thus agreed to pay? These were not at all defined by oral or written expression of the parties. Consequently, if the contract was not wholly void for indefiniteness, the services for which the defendant impliedly agreed to pay must have been such as those generally sought when a principal employs an agent to bring about the contract which is the principal's objective, viz.: services which shall constitute the "procuring cause," or the "effective cause" of the contract. In the Restatement of Agency, Section 448, effective cause is defined as efforts by the agent "sufficiently important in achieving a result for the accomplishment of which the principal has promised to pay him so that it is just that the principal should pay the promised compensation." This general definition is obviously broad. And necessarily so, because of the breadth of the subject matter to which it is applicable. Indeed, it would be difficult to contrive a specific definition for application to cases in which the objective of the relationship is twofold: i. e., negotiated contracts and also contracts to be awarded on competitive bids after invitation duly publicized.

■ Before attempting to apply the rule to the facts of this case another feature of the relationship requires mention. Here the plaintiff's agency to procure Government contracts was an *exclusive agency*. There is utterly nothing in the facts to justify the inference that the defendant delegated to the plaintiff an exclusive *right* or *power* to secure Government contracts. By granting an exclusive agency the defendant promised only that in securing Government contracts the plaintiff should be free from competitive endeavor by other agents of the defendant: the defendant was not itself precluded from competing with the plaintiff for the achievement of that objective. Restatement of Agency, Section 449(b).

Whether the plaintiff was the effective cause of the two contracts here involved is a question which must be determined against the setting of this case. And the evidence fairly delineates that the setting was as follows. It was believed that the Government from time to time would have requirements originating from various procurement agencies from which it would invite competitive bids. The Government procurement procedure was standardized by published regulations which were available to the public. There is no evidence in this case of deviations from the prescribed procedure: certainly none of deviations pertinent here. The standard procedure was such that the specifications for the proposed contracts were formulated by official personnel without opportunity for prospective bidders or others to influence the detail of the specifications. Certainly, there was no evidence that the plaintiff did anything whatever—and the only permissible inference is that there was nothing he could properly do—to assist the defendant by bringing about specifications favoring the defendant. A reasonable time before the closing date for the bids invitations to bid containing the detailed specifications of the proposed contract are generally publicized and mailed to a list of prospective bidders. Such lists are compiled and maintained by the official agency for the various categories of procurement requirements. A contractor, if not theretofore on an appropriate list, is automatically added to a list for purposes of future invitations to bid. The defendant had had at least one Government contract a few

years before the first contract here involved. Manufacturers not already on a particular list may be added thereto on request. Whether such a request to be effective must be supported by a showing of capacity to perform does not appear from the evidence. The invitations with the pertinent specifications are published in trade papers to which interested manufacturers generally subscribe—and to one of which, at least, this defendant subscribed prior to the first contract involved. The official agency which issued the invitations to bid on the contracts here involved and the agency which received the bids was located in New York City: the defendant's main office was in New York City.

Such being the background situation I proceed to consider whether the plaintiff has proved that he was the effective cause of the making of the two contracts here involved. The plaintiff testified that he caused the defendant's name to be added to the lists of prospective bidders maintained by some procurement agencies. Assuming that was true and assuming that the fact might be relevant in a suit on *quantum meruit,* it is nevertheless irrelevant here for complete lack of connecting evidence showing that the defendant's opportunity to bid was caused by placement on a list by the plaintiff or indeed that the defendant ever received an invitation to bid on these particular contracts. Indeed, the plaintiff's position throughout has been confined to the claim that he "caused" the contracts not by the placement of defendant's name on a list but by providing the defendant with information. But as to this the only information so provided as to the first contract was that found in Finding 10.

The plaintiff's letter of May 18, 1948 (Finding 10) did indeed purport to inform the defendant that a pertinent invitation to bid would be issued by the Army Quartermaster's Office in 60 to 90 days. But the letter failed to contain any information as to the specifications for that contract: the information therein was not such as to put the defendant

in a position to begin at once the necessary preparations for a bid. This was information that the defendant first acquired on June 8, 1948 from a publication of the invitation to bid which was carried in a trade journal to which the defendant subscribed. See Finding 12. Thus the defendant from this source already had all necessary information as to this invitation before the plaintiff's letter of June 19, 1948 which was apparently written with knowledge that the invitation had already been published.

From this it is apparent that the only effect of the plaintiff's May letter, which could possibly have been useful to the defendant, was perhaps to put it on the alert for the expected publication of the invitation. Where the defendant's routine office arrangements were such that it was natural to infer that the invitation to bid would have come to its attention through the trade journal it is impossible to find that the plaintiff has proved that its letters of May 18, 1948 and June 19, 1948 were the effective cause of the contract. And there is no evidence whatever that the defendant received any further information or services from the plaintiff relating to that contract. Certainly the defendant did not expressly promise to pay the stipulated commission for such insignificant information as was actually furnished by the plaintiff. Indeed, in the April 22, 1948 meeting, the plaintiff did not promise to furnish advance notice of forthcoming invitations nor even hold himself out as able to provide such information. In the absence of express obligation to pay a substantial fee for information of such doubtful value, at least in the situation which existed here, it is wholly untenable to imply a promise to pay for such meagre service: it would be unreasonable to infer that the defendant intended thus to pay for information which its own office force could easily clip from a published source.

Equally ineffective were the plaintiff's services in connection with the second

contract here involved, which are summarized in Finding 13.

■ And so, finding no contractual obligation, express or implied, to pay for the only services shown to have any connection whatever with the two contracts involved, I hold that the plaintiff is not entitled to recover.

The plaintiff may ask "How is it possible for an agent to procure for his principal a contract to be awarded by a specified contractee on competitive bids if such services as he is found to have rendered here do not constitute a procuring cause?" The obvious difficulty of finding a satisfactory answer to such a question perhaps explains the absence of citation of cases in which an agent on a commission basis is held to have been the procuring cause of a contract awarded on a bid formulated and submitted solely by his principal. To obtain such a contract, in the field of legitimate effort there seems to be little room for the useful activity of a specially appointed sales agent. But the mere fact that the plaintiff, through no fault of the defendant, was unable to find anything he could do to cause a contract to be awarded in competitive bids, does not justify a holding that, notwithstanding, he is entitled to compensation.

■ But even if the plaintiff had proved that he had furnished services for which under the agency contract he was entitled to the stipulated commissions, I hold that he would not be entitled to recover. This is because such a contract would be in contravention of the public policy declared by Executive Order 9001, 50 U.S.C.A.Appendix, § 611 note, which requires that every contract with the Department of the Army, the Navy Department, etc., shall contain a warranty which in part states: "The Contractor warrants that he has not employed any person to solicit or secure this contract upon any arrangement for a commission, percentage, brokerage or contingent fee." Under the prevailing interpretation of the Order in this Circuit, the plaintiff does not escape the ban of the Order merely because of absence of proof that the plaintiff has exercised undue influence or was in any way reprehensible in his endeavors to secure government contracts in the defendant's behalf. As Judge Swan puts it, "No exception is made for cases in which nothing sinister was contemplated or done under the terms of the contingent fee contract." Mitchell v. Flintkote Co., 2 Cir., 185 F.2d 1008, 1010. As so interpreted, the Order closely resembles the law as stated by some early Supreme Court cases on the problem of contingent fee arrangements for securing Government contracts. Providence Tool Co. v. Norris, 2 Wall. 45, 17 L.Ed. 868; Meguire v. Corwine, 101 U.S. 108, 25 L.Ed. 899; Hazelton v. Sheckels, 202 U.S. 71, 26 S.Ct. 567, 50 L.Ed. 939. Subsequent Supreme Court cases decided before the promulgation of Executive Order 9001, held that contingent fee contracts are not void on their face; a showing of something improper or sinister was thought necessary. See Steele v. Drummond, 275 U.S. 199, 48 S.Ct. 53, 72 L.Ed. 238; Valdes v. Larrinaga, 233 U.S. 705, 34 S.Ct. 750, 58 L.Ed. 1163. But such cases are no longer determinative in view of the declaration of public policy embodied in the Executive Order thereafter promulgated. A number of state courts interpret Order 9001 as declarative of the rule of Steele v. Drummond. See Buckley v. Coyne Electrical School, Inc., 343 Ill.App. 420, 99 N.E.2d 370. But on this point, Erie Ry. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, is inapplicable and state law is not controlling. See Mitchell v. Flintkote Co., supra.

The fact that this case involves contracts which were the product of competitive bidding does not remove it from the reach of the Executive Order. That point also is established by Mitchell v. Flintkote Co., supra. Nor is this case outside the Order merely because here it is a government contractor, instead of the Government itself, which asserts

the illegality of the agency contract. Although there are some State court decisions to contrary effect, a reading of Mitchell v. Flintkote Co., supra; Bradley v. American Radiator and Standard Sanitary Corp., 2 Cir., 159 F.2d 39, and Reynolds v. Goodwin-Hill Corp., 2 Cir., 154 F.2d 553, clearly supports my holding on that point.

I conclude, therefore, that the defense of illegality must be sustained unless, as the plaintiff argues, he falls within the express exception contained in Executive Order 9001, which states that, "This warranty shall not apply to commissions payable by contractors upon contracts or sales secured or made through bona fide established commercial or selling agencies maintained by the contractor for the purpose of securing business."

As to this, in Reynolds v. Goodwin-Hill Corp., 2 Cir., 154 F.2d 553, 555, it was held that the defendant's sales director came under the above exception and was entitled to a contingent fee for his efforts in procuring Government contracts for the defendant. In referring to the exception Judge L. Hand stated: "The purpose of the section is reasonably plain: the payment of contingent fees was permitted when made to an agent employed generally to drum up business for the contractor, presumably because it was thought wise to allow contractors to do business in their accustomed way, in spite of the possibility that the inducement of a commission might on occasion result in abuses. But it was also thought that to employ persons to procure specific contracts upon a contingent fee, was likely to result in selecting those who had, or were supposed to have, some especial access to officials; and this could not be tolerated."

In Bradley v. American Radiator and Standard Sanitary Corp., 2 Cir., 159 F.2d 39, affirming the decision of Judge Leibell, D.C., 6 F.R.D. 37, the Court held that in this type of case the burden is on the plaintiff to bring himself within the exception to Order 9001. The Court also held that the exception did not extend to an agency agreement to secure a specific government contract; it reaffirmed the doctrine quoted above from the Reynolds case and further noted that the exception created a "privileged class" which should be "jealously restricted."

From this résumé of the applicable law as it has been established in this Circuit, it will be noted that the only cases, Mitchell v. Flintkote Co. and Bradley v. American Radiator, in which the questioned agency contract was held to lie outside the exception of the Executive Order were cases involving contracts to secure a specific contract. Thus is posed the question whether the rationale of these cases requires an extension of that doctrine to the situation here which involves an exclusive efforts contract to secure any and all government contracts and a non-exclusive efforts contract to secure non-governmental contracts for the defendant. Also presented is the converse question whether the situation here falls within the holding of the Reynolds case that a non-exclusive agreement by a government contractor to pay its "sales director" a 5% commission upon all contracts which he might procure, is within the Order's exception.

The purpose of the exception, as deduced by the Court in its Reynolds opinion, was to facilitate the war effort by permitting manufacturers, who were potential contractors with the Government, to pay to their sales agents commissions upon all sales that they procured if that was their "accustomed way" of conducting their sales operations. To forbid such payments in such cases, it was thought would disturb the manufacturer's existing practice and thus somewhat impair the war effort. Under such rationale, perhaps a contract by the defendant here, which on the evidence followed the practice of promoting its sales through agents compensated by commissions, whereby it employed the plaintiff as its sales agent, without distinction between government

and private contracts, would as in the Reynolds case fall within the exception. But here the plaintiff himself testifies that in the contract on which he claims there was a distinction between his rights on government contracts and his rights on private commercial contracts. On the former he claims to have had an "exclusive" agency which under the law of agency meant that the defendant would employ no other agents to compete with him in securing government contracts. Restatement of Agency, Section 449, comment b. 2 Am.Juris., Agency, Section 307. But as to commercial contracts he testifies that his agency was non-exclusive: only as to such contracts was the defendant left free to employ competing agents. Thus by the claimed contract, the plaintiff was singled out from other sales agents of the defendant and given a preferred status as to government contracts although there was a complete absence of evidence to show that thus to compartmentalize its sales organization was in accordance with the defendant's "accustomed way." From this, it is apparent that the case here is not within the rule of the Reynolds case.

The same feature of the contract here brings the case within the rationale of the holding in the Mitchell and Bradley cases. If there is danger that abuses may result when a manufacturer goes outside its regular sales organization for the selection of an agent to procure a specific government contract, the danger is at least equally manifest—perhaps even more so—when the manufacturer establishes an outside agency as its exclusive representative to obtain all government contracts. In the one case as much as in the other, the selection may be attributable to the fact, actual or supposed, that the agent selected has some especial access to official personnel, although in both cases the true fact may be that the selection was due to the actual or supposed familiarity with government procurement procedures. Moreover, the exclusiveness of an agency for all government contracts is a feature

inviting question. For if truly the selection was made because of some special competence or "know-how" in the government procurement field, it is hard to understand why the agent should demand, as Ballard did, and the principal should grant, as Ballard says Tingue did grant, protection to Ballard from competition by Tingue's "run-of-the-mine" sales agents. And, lastly, the very fact, noted in an earlier section of this opinion, that in securing contracts to be awarded on competitive bids there seems to be little room for the legitimate activity of a specialized sales agent, suggests the possibility that agreements for large fees contingent on such awards may tacitly rest upon the expectation of improper efforts inimical to the integrity of the procurement procedure.

I hold, therefore, the commissions here sued for were not authorized under the exception to the Executive Order, and that the contract on which the plaintiff claims was against public policy and hence unenforceable.

In reaching this conclusion I have put no reliance on United States v. Paddock, 5 Cir., 178 F.2d 394, rehearing denied with supplemental opinion in 180 F.2d 121, certiorari denied 340 U.S. 813, 71 S.Ct. 41, 95 L.Ed. 597, because of uncertainty as to the underlying facts to which the opinion were addressed. If the agent there involved had been employed to drum up business generally for his principal—not merely to secure government contracts—and if it had been the principal's general practice to employ salesmen on a commission basis, under the rationale of the Reynolds case he would seem to come within the exception to the Order. The suggestion in the Bradley case that only a continuing relationship would bring an agent within the exception, did not necessarily import that the particular relationship must have inception before the original promulgation of the Executive Order. Indeed, the relationship involved in the Reynolds case was one not formed until after the Order was in effect. If the

Paddock decision was based on the sole fact that the agent's only compensation was by way of commissions, it goes further than any case in this Circuit and indeed is in conflict with Reynolds. Only if, and to the extent, that Paddock may be based upon the fact that the principal deviated from its usual sales practice in employing an agent on a commission basis to secure government contracts, is it supporting authority for my holding here.