Edmund V. BROWNE, Plaintiff,

v.

R. & R. ENGINEERING CO., etc., Defendant.

Civ. A. No. 1873.

United States District Court
D. Delaware.

July 21, 1958.

Maximillian J. Klinger, Philadelphia, Pa., Morton E. Evans, Wilmington, Del., for plaintiff.

John M. Metten and James P. Collins (of Metten, Healy & Collins), Wilmington, Del., for defendant.

LAYTON, District Judge.

Jurisdiction here is based upon diversity of citizenship.

I find the following facts: Plaintiff, a registered engineer of eighteen years experience, is employed by Catalytic Construction Co. in Philadelphia. He is experienced in bidding on government contracts. Through his work at Catalytic, he learned that certain sub-contracts were about to be let through Swinerton & Walbert Co. for the Atomic Energy Commission which a small machine shop might hope successfully to bid on and complete. He had a friend named Weber, an engineer, who in conjunction with a partner, DuHadoway, operated a very small machine shop near Wilmington, known as R. & R. Engineering Co. This shop had but three regular employes, the two partners and one other workman. With one or two exceptions, R. & R. had never had a contract for work in excess of $1,000. Plaintiff told Weber about the subcontracts in question and after some discussion the partners indicated a desire to bid upon them. However, R. & R. was not on the bidders' list and, moreover, Weber had no knowledge as to how to prepare bids upon government proposals. Accordingly, it was preliminarily agreed that plaintiff would attempt to get R. & R. placed upon the bidders' list, make a number of essential engineering drawings and assist Weber in preparing estimates or bids in return for which plaintiff would be paid $1,000 for the drawings and either be made a partner or paid a percentage of the gross amount of any contract if and when obtained. From about February 24 to March, 19, 1956, plaintiff and Weber worked every night and week end (altogether about 300 hours) in preparing the bids. Plaintiff, meantime, succeeded in getting R. & R.'s name on the bidders' list. Their bid on the first contract in the sum of $1,300,000 was too high. Almost immediately, another contract came up and plaintiff and Weber busied themselves in preparing estimates which were successful. This contract turned into a series of contracts amounting to $284,783 of work. R. & R. immediately had to obtain new capital to enlarge its facilities and purchase materials in order to perform the contract. Plaintiff spent some time trying to raise capital for Weber but was unsuccessful. Finally, Weber raised the necessary funds. During the intense pressure of work in preparing bids, etc., the question of plaintiff's compensation had been forced into the background. Now he began to press for a binding agreement. Weber was uncooperative. On April 23, 1956, R. & R. was incorporated. Meanwhile, R. & R. gradually increased its payroll from three to twenty-seven employes, and Weber and DuHadoway not only doubled their salaries but also caused themselves to be paid large bonuses at the year's end. Plaintiff seeing himself slowly being frozen out of the situation, renewed his demands and on one or more occasions became angry at Weber's refusal to enter into what he thought was a fair agreement. Finally, Weber told plaintiff to submit a bill. The bill came to $14,500, or 5% of the gross amount of the contract price. Weber refused to pay this and sent a check for $5,600, of which $1,000 represented the stipulated price for the drawings. Plaintiff received this payment under protest and filed suit for $14,500.

I find that a figure of between 7½% and 10% of the gross contract price would normally represent fair compensation in this locality to a person who not only found the opportunity but, in addition, performed multiple services similar to those rendered by plaintiff in this case. However, while the plaintiff, in submitting a bill for $14,500, was not bound by that amount after Weber refused payment, nevertheless, this bill must be regarded as some evidence of what plaintiff regarded as fair compensation. Under all the circumstances, I find 7½% of the gross contract price to be fair compensation for plaintiff's work. This sum includes the $1,000 agreed on for the drawings.

Neither the plaintiff nor the defendants had ever heard of Executive Order No. 9001 (hereinafter referred to)[1] and at no time did the plaintiff do any improper act in attempting to procure contracts for the defendants. In fact, all bids were on a competitive basis.

The correct disposition of this case calls for the answer to two questions, (1) should the defendants be permitted to amend their pleadings during trial in order to raise the defense of illegality, and (2) does the public policy of the United States as reflected by Executive Order No. 9001 defeat the plaintiff's claim?

■ Rule 8(c) F.R.C.P., 28 U.S.C.A., requires that all affirmative defenses be specially pleaded.[2] The defense of illegality was not raised in either the defendants' original or amended answers. On the last day of the trial, the defendants sought leave to introduce Executive Order No. 9001 into the record, thereby for the first time raising the defense of illegality. At my suggestion, the defendants then moved to amend their answers in accordance with Rule 8(c) F.R.C.P. I reserved a ruling on this motion. Inasmuch as the defense raises a matter of law requiring the taking of no further evidence, and since the plaintiff was given ample opportunity to file a brief in opposition, no prejudice resulted. Moreover, to deny the motion might result in defeating the national public policy. Compare Oscanyan v. Winchester Repeating Arms Co., 103 U.S. 261 (267), 26 L.Ed. 539. Accordingly, I think it better to decide the policy question on the merits. The motion to amend is granted.

■ Long before the promulgation of Executive Order No. 9001, the Supreme Court had taken occasion to condemn as contrary to public policy the entering into of agreements calling for fees contingent upon the obtaining of government contracts, favorable legislation and the like. Oscanyan v. Winchester Repeating Arms Co., supra. Hazelton v. Sheckells, 202 U.S. 71, 26 S.Ct. 567, 50 L.Ed. 939; Tool Co. v. Norris, 2 Wall. 45, 69 U.S. 45, 17 L.Ed. 868. In the latter opinion, Justice Field took occasion to remark:

> "It [public policy] has been asserted in cases relating to agreements for compensation to procure legislation. These have been uniformly declared invalid, and the decisions have not turned upon the questions, whether improper influences were contemplated or used, but upon the corrupting tendency of the agreements."

1. "The contractor warrants that he has not employed any person to solicit or secure this contract upon any agreement for a commission, percentage, brokerage, or contingent fee. Breach of this warranty shall give the Government the right to annul the contract, or, in its discretion, to deduct from the contract price or consideration the amount of such commission, percentage, brokerage, or contingent fees. This warranty shall not apply to commissions payable by contractors upon contracts or sales secured or made through bona fide established commercial or selling agencies maintained by the contract or for the purpose of securing business." 50 U.S.C.A.Appendix Sec. 611 note.

2. "(c) In pleading to a preceding pleading, a party shall set forth affirmatively * * * illegality * * * and any other matter constituting an avoidance or affirmative defense."

Contrary to this view, at least one federal court, before the promulgation of Executive Order No. 9001, refused to strike down a similar contract upon the ground that nothing sinister or improper appeared to have been done in the obtaining of the government contracts. Coyne v. Superior Incinerator Co., 2 Cir., 80 F.2d 844. And a substantial number of state courts have adopted this less exacting yardstick,[3] but as far as my research discloses, no federal court has so held since Executive Order No. 9001 was promulgated. Moreover, the Executive Order establishes a federal public policy having the force of law, Givens v. Zerbst, 255 U.S. 11, 41 S.Ct. 227, 65 L.Ed. 475, as to which the views of state tribunals cannot be regarded as controlling. Ballard v. Tingue Mills, D.C., 128 F.Supp. 683 (691).

■ After careful consideration, I have concluded that the plaintiff here cannot succeed for the reason that the compensation sought to be recovered was contingent upon the award of a government contract. Bradley v. American Radiator & Standard San. Corp., D.C.N.Y., 6 F.R.D. 37, affirmed, 2 Cir., 159 F.2d 39; Le John Mfg. Co. v. Webb, 95 U.S. App.D.C. 358, 222 F.2d 48; Mitchell v. Flintkote Co., 2 Cir., 185 F.2d 1008; Weitzel v. Brown-Neil Corporation, D.C. W.Va., 152 F.Supp. 540; Ballard v. Tingue Mills, D.C.Conn., 128 F.Supp. 683. In the Flintkote case, the Court of Appeals for the Second Circuit said [185 F.2d 1010]:

"* * * An agent who is hired to ensure that his employer is given an opportunity to bid is just as much an instrument in 'securing' the contract which results from an accepted bid as one who is hired to bring an employer's offer to fruition through personal solicitation. Where, as in the present case, the board which prepared specifications also reported the defendant's name to purchasing agencies as an available source of supply, it can hardly be said that the plaintiff, assuming that he performed under the contract, did not aid the company 'to secure' the contract within the meaning of Order No. 9001. The proscription of contingent fee contracts was intended to protect government agencies against corrupting influences, and competitive bidding does not completely safeguard this purpose. The lowest bid is not always taken, since administrative officials have some discretion in passing on the quality of the goods tendered, as well as on the ability of the bidder to perform. Hence bidding does not ensure that improper influence will not be brought to bear on the officials who have the responsibility of accepting or rejecting the bids. As Mr. Justice Holmes pointed out in Hazelton v. Sheckells, 202 U.S. 71, 79, 26 S.Ct. 567, 50 L.Ed. 939, it is the tendency to corruption, not what was done in the particular case, which justifies the rule.

"Executive Order No. 9001 is rigorous in its requirements. The Order flatly requires that no person be employed on contingent fee 'to solicit or secure' the contract. No exception is made for cases in which nothing sinister was contemplated or done under the terms of the contingent fee contract. In this respect the Order closely approximates the rule as stated in the older Supreme Court cases. * * *"

In Le John Mfg. Co. v. Webb, supra, the Circuit Court of Appeals for the District of Columbia reversed the trial court which found, as here, that plaintiff used no corrupt or sinister practices in the solicitation of government contracts, saying in part [95 U.S.App.D.C. 358, 222 F.2d 51]:

"The District Court in upholding the contingent fee agreement relied in part on a finding of fact that 'the

3. Compare Buckley v. Coyne Electrical School, Inc., 343 Ill.App. 420, 99 N.E.2d 370.

efforts of the plaintiff on behalf of the defendant did not involve the use of any political or special influence, or any corrupt or sinister practices contrary to the public interest.' Appellant challenges this finding as clearly erroneous. But in any event it is clear that actual evidence of improper conduct is not necessary to render such agreements unenforceable: 'The law looks to the general tendency of such agreements; and it closes the door to temptation, by refusing them recognition in any of the courts of the country."

Nor does it matter here that no express contract was ever entered into. If a contract calling for compensation contingent upon the obtaining of government contracts violates the public policy, then surely, similar services sought to be recovered for on a quantum meruit basis must be equally condemned. Le John Mfg. Co. v. Webb, supra, 222 F.2d at page 50.

I have given considerable thought to the fact that this case is devoid of proof that the plaintiff was in any fashion retained "to solicit or secure" the contract in question. Curiously enough, only one case contains a discussion on this point.[4]

In at least three of them, Bradley, Le John Mfg. Co. and Ballard, there seems to have been no thought that the plaintiff agent was to make any direct contact with government sources in order to "solicit" or "secure" contracts. In most of the cases, the bidding was competitive which, to a substantial degree, rules out the use of improper influence. Yet the main thrust of the language of all these cases strongly condemns the agreement whether or not any actual solicitation or use of improper influence was contemplated. I can only conclude that the whole field of arrangements involving commissions for the obtaining of government contracts based upon a contingency is so inherently inimical to the public interest and morals that the Courts look, not so much to what was actually done, as to the evils inherent in the system.[5] Whether or not the Third Circuit Court upon review may adopt a more tolerant approach to the peculiar facts here in the light of the language of the Executive Order,[6] I feel bound by the broad sweep of the holdings of the cases above cited.

I conclude that Executive Order No. 9001 governs the proceeding. Regrettably, the plaintiff cannot recover.[7]

Let an Order be entered on notice.

---

4. The point was touched on in the Flintkote decision at the top of page 1010, of 185 F.2d, where the Second Circuit Court apparently approved Judge Leibell's conclusion in the Bradley case that proof of solicitation was not necessary.

5. "The court will not inquire what was done. If that should be improper, it probably would be hidden, and would not appear. In its inception, the offer, however intended, necessarily invited and tended to induce improper solicitations, and it intensified the inducement by the contingency of the reward." Hazelton v. Sheckells, 202 U.S. 71, 26 S.Ct. 567, 568, 50 L.Ed. 939.

6. By this I mean that there was nothing in this plaintiff's agreement which

contemplated his approaching the parties charged with awarding these contracts and attempting to "solicit or secure" such agreements. Aside from contacting his employer about having the defendant placed upon the bidding list, (a seemingly innocuous undertaking in itself) his whole effort was to aid and assist the defendant in preparing its bids.

7. I say regrettably advisedly. Defendants, originally happy enough to have plaintiff's sources of information, advice and energetic assistance, have now cast him aside based upon the tardily discovered defense of breach of public policy, a violation of which (even though both sides were innocent and nothing corrupt was done or even contemplated) they participated in as much as he.