Lemuel Lester **WEITZEL**, Plaintiff,

v.

**BROWN–NEIL CORPORATION,**
Defendant.

Civ. A. 463–F.

United States District Court
N. D. West Virginia,
Clarksburg Division.

June 19, 1957.

W. G. Stathers and Mary Frances Brown (Stathers & Cantrall), Clarksburg, W. Va., for plaintiff.

Oscar J. Andre, George W. McQuain, and Willis O. Shay (Steptoe & Johnson), Clarksburg, W. Va., for defendant.

HARRY E. WATKINS, Chief Judge.

Plaintiff is engaged in the business of a manufacturers' representative, i. e., a salesman of specially manufactured machinery and equipment, and is a citizen of the Commonwealth of Pennsylvania. Defendant is a West Virginia corporation, organized in 1951 for the purpose of acting as a prime contractor in the performance of defense contracts. In this action, plaintiff seeks to recover commissions on two large contracts for the fabrication and installation of two decontamination booths for the Atomic Energy Commission, which contracts were entered into by defendant in 1953 and the work concluded in 1955. Defendant was paid a total of $1,834,820.66 for its work on these two contracts, and plaintiff here seeks, on the basis of an implied contract, a commission of three per cent of that figure, or $55,044.62.

Defendant first denies the existence of any such implied contract, and secondly states that if such a contract did exist, it is unenforceable due to the covenant against contingent commissions which is included in all Government contracts, including the two contracts involved here. The issue, then, is simply whether there was a valid, enforceable implied contract between these parties. Upon the evidence presented to this Court, sitting without a jury, I find that there was not, and defendant must prevail.

### Findings of Fact

The defendant was formed, as indicated by a "History and Facility Record" introduced in evidence, to act as a prime contractor for defense contracts. The corporation was organized to pool the facilities and manpower of four small corporations in Clarksburg, West Virginia, with each participating company owning one-fourth of the capital stock. The operating heads of the four corporations served as officers and directors of the defendant.

Since 1949, plaintiff has been exclusively engaged as a manufacturers' representative for two firms, Forney's, Inc., of New Castle, Pennsylvania, and Hinkle Brothers, Inc., of Clarksburg, West Virginia. Hinkle Brothers was one of the four owners of defendant, but Forney's was not one of the four owners. In 1953, on behalf of Forney's, plaintiff contacted a firm of design engineers in Detroit, Michigan, who were at that time designing two decontamination booths for the Atomic Energy Commission. This firm furnished Forney's some drawings of certain component parts for the booths, called templates, dollies, and tracks, and asked Forney's to submit a bid on the fabrication of those parts. Plaintiff, for Forney's, quoted some prices on these parts but due to a change in plans, it developed that the Detroit firm was not going to do the purchasing for the projects, but rather these component parts would be included in overall Government prime contracts. Plaintiff was then instrumental in having Forney's considered as a bidder on the prime contracts. Forney's obtained a set of drawings and specifications for the booths, but upon scrutiny of these papers the management of Forney's decided that they did not care to bid on the entire project as Forney's did not possess the capital or physical plant to undertake the prime contracts.

Plaintiff then obtained permission from Forney's to contact the other firm he represented, Hinkle Brothers, Inc., to see if either Hinkle Brothers or defendant corporation were interested in bidding on these AEC contracts. Through a telephone call to Leslie A. Hinkle, president and managing officer of Hinkle Brothers and a director of defendant, plaintiff ascertained that defendant was interested in bidding on the contracts.

That was plaintiff's first contact with defendant.

On October 6, 1953, Hinkle and Moffatt B. Tolley, the production manager of defendant, drove from Clarksburg to New Castle to look at the drawings and specifications. Plaintiff was not in New Castle on that day, but other personnel of Forney's showed Hinkle and Tolley the papers. Tolley decided that defendant was capable of undertaking the entire project and was interested in submitting a bid. During that visit to New Castle by Hinkle and Tolley, Forney's indicated that if defendant were the successful bidder on the overall project, then Forney's would like to produce, through a subcontract, the templates and dollies on which they had previously been negotiating with the Detroit design firm. In determining defendant's capacity to handle the entire job, Tolley states that he took into consideration the facilities of the four participating companies which owned defendant, and realized that while some work could be subcontracted to outsiders, a large part of the work would be done by Hinkle Brothers. Ultimately, some 60% of the labor was performed by Hinkle Brothers. The interest of Forney's and Hinkle Brothers in subcontracts at the time of this trip to New Castle is consistent with Tolley's testimony that he felt that work later performed by plaintiff was being performed for these two firms and not for defendant.

On October 13, 1953, plaintiff, Hinkle and Tolley went to Oak Ridge, Tennessee, and obtained a set of drawings and specifications for the overall project. On that occasion, plaintiff met Tolley for the first time and was introduced by Hinkle as "sales manager for Forney's"—a position which plaintiff held in addition to being Forney's manufacturer's representative. Letters dated October 23, 1953, and January 18, 1954, addressed to defendant, signed by plaintiff as "Sales Manager" on Forney's stationery, with one of the letters marked to the attention of "Mr. Moffitt Tollie," indicate that Forney's was interested as a sub-

contractor on this project. These letters substantiate Tolley's testimony that he dealt with plaintiff as a representative of Forney's and Hinkle Brothers on this trip to Oak Ridge and in subsequent dealings.

Returning to Clarksburg with the drawings and specifications, Tolley and other engineers studied the papers and obtained bids upon portions of the work, including bids from the four owner companies of defendant, and bids from Forney's. Then on October 20, 1953, plaintiff, Hinkle and Tolley again went to Oak Ridge, to attend a conference of all parties interested in bidding on this project. A list of persons attending this conference prepared by representatives of the AEC was admitted into evidence and plaintiff's counsel stress the fact that plaintiff is listed, along with Hinkle and Tolley, as a representative of defendant. However, that is not a controlling factor in determining plaintiff's position at this meeting, as there are other persons listed who were representing prospective subcontractors. Furthermore, Hinkle testified that although listed at this meeting as a representative of the defendant, Hinkle was in fact acting for Hinkle Brothers throughout the obtaining of these contracts because the bulk of the work would go to his firm, Hinkle Brothers, if defendant were the successful bidder.

On November 29, 1953, plaintiff, Hinkle and Tolley went to Oak Ridge a third time. During the evening and night, in one of their hotel rooms in Knoxville, Tennessee, the three men reviewed the figures used in arriving at a final bid, and prepared the bid form to be taken to a stenographer the next morning. The various expenses of the job were discussed and compiled, such as insurance, counsel fees, etc., but nothing was said by any of the three men about including a sum to cover plaintiff's compensation, and no allowance was made for such an expense. Plaintiff did not see the breakdown of expenses, inasmuch as that was a matter with which Hinkle and Tolley were more concerned, but the

omission from the bid of any sum to cover payment to plaintiff is significant to indicate that Tolley and Hinkle must have considered plaintiff to be working for the two interested subcontractors.

At the time of submitting the bid, no profit was planned for defendant. It was anticipated that any profits on the contracts would be made by the various subcontractors, and defendant would only supervise the administration of the contracts. It was planned at the time of the bidding that Forney's and Hinkle Brothers would do most of the purchasing of materials, with Hinkle Brothers given a 20% mark-up on materials for handling their part of the purchasing. It later developed that defendant had to do the purchasing, so defendant did make a profit of $87,957.52 (before Federal Income taxes), largely from the 20% mark-up originally planned for Hinkle Brothers. In the computation of the bid figure, then, not only was there no specific expense figure included to pay plaintiff, but there was no profit figure or any other sum from which plaintiff could be paid.

The final bid was to be submitted on a form provided by the AEC, which contained the following paragraph:

"The undersigned represents (check appropriate boxes): (1) that the aggregate number of employees of the bidder and its affiliates is ——— 500 or more, x less than 500; (2) (a) that he ——— has, x has not, employed or retained any company or person (other than a full-time bona fide employee working solely for the bidder) to solicit or secure this contract; and (b) that he ——— has, x has not, paid or agreed to pay to any company or person (other than a full-time bona fide employee working solely for the bidder) any fee, commission, percentage or brokerage fee, contingent upon or resulting from the award of this contract for the construction of Spray Booth Equipment in Decontamina-tion Building No. K–1420, and/or this subcontract for the construction of Spray Booth Equipment in Decontamination Building No. X–705, and agrees to furnish information relating thereto as requested by the Contracting Officer. (Note: For interpretation of the representation, including the term 'bona fide employee,' see General Services Administration Regulations, Title 44, secs. 150.7 and 150.5(d) Fed.Reg., Dec. 31, 1952, Vol. 17, No. 253."

Tolley testified that about 2:00 a. m., November 30, 1953, he read this warranty to the other two men. Plaintiff denies hearing that paragraph read; Hinkle does not remember. At any rate, Tolley was working with the bid form and was responsible for entering the "x" in the three blanks. This is another indication that on the day of the submission of the bid, Tolley did not consider plaintiff to be working on behalf of the defendant.

Plaintiff testified that Tolley promised to put him on defendant's payroll as a means of compensating plaintiff for obtaining these contracts. Tolley, on the other hand, testified that his understanding about putting plaintiff on the payroll was that because of the size of these contracts, both of plaintiff's employers, Hinkle Brothers and Forney's, would be so busy during the time that they worked on the decontamination plant parts that they would need no manufacturer's representative in the field to solicit additional business for them. Therefore, it was Tolley's understanding that plaintiff wanted to be associated with defendant to assist in purchasing materials for these contracts. However, Tolley found that because of the close figuring he and his associates had made on the bid, the defendant could not afford any outside help so plaintiff was never employed. Plaintiff has continued to represent Forney's and Hinkle Brothers, obtaining other work for them, but has had no further connections with the defendant corporation.

Defendant was the low bidder on the two decontamination booths, and was awarded contracts for the construction and installation of them. Defendant divided up the work among its four owners, with Hinkle Brothers receiving $547,430.68 for its subcontract, as compared with $138,434.79 for the next highest sum paid any of the owners, and the latter figure included the price of some materials, whereas the sum paid Hinkle Brothers was entirely for labor. The bid of Forney's on the templates and dollies was not the lowest bid for that work, but Forney's was allowed to resubmit a low bid and was given a subcontract totaling $116,863.11. One of the owner companies of defendant, Barnes & Brass Electric Company, had been the original low bidder on the work given Forney's, but at Leslie Hinkle's insistence the subcontract was given Forney's, since it had been through Forney's that defendant learned of the AEC projects. The major part of the work on the two contracts was performed by Hinkle Brothers, with a substantial contribution by Forney's, which substantiates Tolley's testimony that he felt that plaintiff had at all times been working for his two regular employers, Forney's and Hinkle Brothers.

Tolley further testified that prior to 1953 defendant had done work on three other Government contracts; and that Tolley Engineering Company, another of the four owners of defendant, had had four or five Government contracts while Tolley was president of that company prior to 1953. As a result of these contracts, Tolley had become familiar with the covenant against contingent commissions before he even learned of these two contracts for the decontamination booths. This knowledge added to Tolley's belief that plaintiff would not look to defendant for compensation, since plaintiff had not theretofore done any work for defendant. Plaintiff testified that he had not known specifically of the covenant being in Government contracts until after defendant had been awarded these two contracts and he had been denied payment for his services.

Taking all the evidence into consideration, it is clear that Tolley at all times treated plaintiff as a representative of Forney's and Hinkle Brothers. While he was the operating head of defendant corporation during the period of obtaining and carrying out the work on those two contracts, on February 22, 1956, Hinkle Brothers bought all the capital stock of the other three owners of defendant, and Tolley no longer has any connection with defendant.

The testimony of Hinkle is not too clear as to whom he thought plaintiff was looking to for compensation. However, he recognized an obligation of Hinkle Brothers toward plaintiff and offered plaintiff a check in partial payment for services rendered Hinkle Brothers in obtaining the subcontract. Plaintiff returned the check, stating that he felt defendant should pay him for his services. This attempted payment by Hinkle occurred after defendant had been awarded the contracts for the decontamination booths.

Plaintiff has not shown by any credible evidence that defendant, through Tolley or Hinkle or any other person, ever accepted plaintiff's services with the understanding that plaintiff expected compensation from defendant. Nor has plaintiff established that the plaintiff's services were rendered under such circumstances that ordinary men should have realized that plaintiff was looking to defendant for compensation. All plaintiff's acts are consistent with the actions of a man representing two prospective subcontractors which were actively interested in seeing that defendant got these two Government contracts so that the subcontractors could do the major portion of the work. Taking into consideration all the evidence, I find that defendant did not accept plaintiff's services under such circumstances as to give rise to an implied obligation to pay therefor.

As will be later discussed under Conclusions of Law, plaintiff attempts to place himself within an exception of the covenant against contingent fees re-

quired in all Government contracts. General Regulation 12, of the General Services Administration, 44 C.F.R. § 150.5 (e) (2) (ii) states, concerning this exception:

"The selling agency should have adequate knowledge of the products and the business of the concern represented, as well as other qualifications necessary to sell the products or services on their merits."

Plaintiff did not have any current knowledge of the overall capabilities of the defendant when he called Hinkle, a few days prior to October 6, 1953, to see if either Hinkle Brothers or defendant were interested in these two AEC projects. Some six to twelve months prior to that, Hinkle had given plaintiff a History and Facility Record of the defendant, listing the capital, engineering experience, tools and machinery of the four owner companies, but from that Record alone plaintiff could not have determined whether defendant's organization could handle these two large contracts in the time specified. Plaintiff testified that while he was familiar with Hinkle Brothers' facilities in October, 1953, he did not know anything about Fuel City Metal Works, Inc., another of the four owners—and in fact has never been to Fuel City's plant. Further, plaintiff testified that he could not recall having been told anything about Tolley Engineering Company, another owner, when Hinkle gave him the History and Facility Record of the defendant. Under this evidence, I find that plaintiff did not have, as required by the above-quoted Regulation, "adequate knowledge of the products and the business" of the defendant "to sell the products or services on their merits."

Plaintiff seeks a commission of three per cent of the gross amount of the two contracts, basing this figure upon his experience with Hinkle Brothers. Expert witnesses introduced by plaintiff testified, and were not controverted by any evidence adduced by the defendant, that three or four to six per cent would be a reasonable commission in payment for plaintiff's efforts with respect to these Government contracts. I find that three per cent would be a reasonable commission if plaintiff were able to establish an enforceable contract existing between these parties.

Conclusions of Law

Another factor negativing any implied contract in this case is the covenant against contingent fees or commissions, which was a part of both contracts for these decontamination booths. It would be an anomaly for the Court with one hand to give effect to an implied contract of the type alleged here, making a contract which was not actually entered into by the parties, only to strike that implied contract down with the other hand for violating public policy. As stated by the Supreme Court as early as 1870:

"Where the case shows that it is the duty of the defendant to pay, the law imputes to him a promise to fulfil that obligation. Such a promise to pay, however, will never be implied unless some duty creates such an obligation, *nor will the law ever imply a promise to do an act contrary to law or in violation of a public duty*." Collector of Internal Revenue v. Hubbard, 12 Wall. 1, 12, 79 U.S. 1, 12, 20 L.Ed. 272. (Emphasis added.)

Under the facts of this case, to imply a promise to pay plaintiff what he seeks in this action would impose an obligation upon defendant which would be contrary to the covenant against contingent fees, and a contract should not be implied where the parties cannot legally make an express contract covering the same matters.

Title 41, U.S.C.A. § 254, states that certain Government contracts shall contain a warranty by the contractor

" * * * that no person or selling agency has been employed or retained to solicit or secure such contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or

bona fide established commercial or selling agencies maintained by the contractor for the purpose of securing business, for the breach or violation of which warranty the Government shall have the right to annul such contract without liability or in its discretion to deduct from the contract price or consideration the full amount of such commission, percentage, brokerage, or contingent fee."

The same requirements are found in Executive Order No. 9001, as amended by No. 9296, and in Executive Order No. 10210, made applicable to the Atomic Energy Commission by No. 10216; see Title 50 U.S.C.A.Appendix, § 611 note.

The two contracts entered into by the defendant, as well as the bid form submitted by defendant, contained covenants in language similar to that of the statute. Plaintiff cites some decisions from state courts that a violation of this warranty does not relieve the contractor from liability to its agent, as the covenant is only a matter between the Government and the contractor. Gendron v. Jacoby, 1953, 337 Mich. 150, 59 N.W.2d 128; Buckley v. Coyne Electrical School, Inc., 1951, 343 Ill.App. 420, 99 N.E.2d 370, certiorari denied 1952, 342 U.S. 927, 72 S.Ct. 366, 96 L.Ed. 691; A. H. Haeseler Bldg. & Contracting Co. v. John J. Dupps Co., Ohio App.1954, 129 N.E.2d 383, syl. 4, 387; Ebeling v. Fred J. Swaine Mfg. Co., 1948, 357 Mo. 549, 209 S.W.2d 892. This same argument was raised in the case of Mitchell v. Flintkote Co., 2 Cir., 185 F.2d 1008, certiorari denied 341 U.S. 931, 71 S.Ct. 804, 95 L.Ed. 1361, but the court held a contingent commission contract illegal in these words:

"The Flintkote agreement with Mitchell was made in New York City, and in his brief plaintiff cites two New York cases which would indicate that the New York courts would hold Order No. 9001 not decisive of the issues in this case. But this does not alter our conclusion. Order No. 9001 states a federal rule of public policy and federal, not state, law governs its applicability. The 'checker-board' pattern imposed by Erie R. Co. v. Tompkins [304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188] is necessarily unsuited to matters subject to federal regulation, and hence state law does not control the disposition of suits which, although they are between non-governmental parties and are brought in a federal court on the basis of diversity of citizenship, involve interpretation or application of federal law. If, as must be conceded, the national government has power to protect itself against contracts of the kind here in question, the protection afforded must be uniform in all its ramifications, including a uniform rule governing the enforceability of contingent fee contracts behind principal and agent." (Citations omitted.) 185 F.2d at page 1011.

The case of Le John Manufacturing Company v. Webb, 95 U.S.App.D.C. 358, 222 F.2d 48, 50, involved one of these contingent fee contracts, and the court stated:

" 'Contingent fee contracts to secure Government business for the employer of the recipient (of the fee) have been held invalid because of their tendency to induce improper solicitation of public officers and the exercise of political pressure.' Muschany v. United States, 1945, 324 U.S. 49, 64, 65 S.Ct. 442, 450, 89 L. Ed. 744. This traditional policy of the courts was reinforced by Executive Order No. 9001 * * *."

After quoting the warranty required by Executive Order 9001, the court continued:

"The purpose of this requirement of the Executive Order is plain: it reflects the public policy long enunciated by the courts, and adds to it a thrust comparable to that of statutory law. See Mitchell v. Flintkote Co., 2 Cir., 1951, 185 F.2d 1008. A compensation contract in violation of the required warranty will not be enforced by the courts."

Another case holding the contractor-agent contract unenforceable as violative of public policy is Bradley v. American Radiator & Standard San. Corp., 2 Cir., 159 F.2d 39.

■ Under these decisions of two Circuit Courts interpreting federal public policy, I conclude as did the District Judge in a similar case, Ballard v. Tingue Mills, D.C.Conn.1954, 128 F.Supp. 683, 691:

"But even if the plaintiff had proved that he had furnished services for which under the agency contract he was entitled to the stipulated commissions, I hold that he would not be entitled to recover. This is because such a contract would be in contravention of the public policy declared by Executive Order * * *."

Plaintiff further states that if the warranty applies as a declaration of public policy, affecting the alleged implied contract here (and I hold that it does), then he comes within the exception set forth within the warranty, "bona fide established commercial or selling agencies maintained by the contractor for the purpose of securing business." As shown by his representation of Forney's and Hinkle Brothers, plaintiff undoubtedly is a bona fide established commercial or selling agency within the meaning of the exception. It is urged that because he had been "maintained" over the years by Hinkle Brothers, plaintiff was "maintained" by the defendant, so far as these Government contracts were concerned, so that plaintiff claims he meets all the requirements of the exception. This, plaintiff argues, is due to the peculiar relationship existing between Hinkle Brothers and defendant, where defendant had no facilities of its own but depended upon the four owners' facilities, and in fact primarily upon the facilities of Hinkle Brothers.

■ This is a specious argument, however, when we look to the meaning of the word "maintained" as interpreted by the courts. A most thorough study of this word of art is found in the case of United States v. Paddock, 5 Cir., 178 F. 2d 394, 395–396:

"The primary decision on this item turns upon the meaning of the word maintained; for present purposes, it is the key word in the exception. If the word is given its usual and ordinary acceptation, and interpreted in the spirit of the order, the exceptive class of procurement agencies is limited to those maintained by the contractor in good faith for the purpose of securing business. To maintain here (according to the dictionary) means to keep in a particular state or condition; to sustain; to keep possession of; to hold and defend; not to surrender or relinquish; to bear the expense of; to support; to keep up; to supply with what is needed. Consequently, a procurement agency, employed merely on contingent fees to secure war contracts, did not meet the test prescribed by the exceptive clause in what was known in army circles as the standard warranty against contingent fees."

On petition for rehearing, 5 Cir., 180 F.2d 121, 122, certiorari denied 340 U.S. 813, 71 S.Ct. 41, 95 L.Ed. 597, the court stated:

"After further careful consideration, we think that the interpretation of the exceptive clause in the warranty contended for by the appellee would nullify the warranty, which certainly was not the intention of the parties. The purpose of this exception, as indicated by the use of the word 'maintained,' was to allow contractors to continue the existence of something already in use, not to introduce a special method of securing government contracts. The idea ordinarily conveyed by the phrase 'to maintain' is not to provide or construct something new, but to preserve free from change a method of doing business to which the party has been accustomed. Cf. Smallwood v. Gallardo,

275 U.S. 56, 61, 48 S.Ct. 23, 72 L. Ed. 152; Moore Ice Cream Co. v. Rose, 289 U.S. 373, 377, 53 S.Ct. 620, 77 L.Ed. 1265; Walker v. Alexander, Tex.Civ.App., 212 S.W. 713, 717; O'Connell v. Kansas City, 208 Mo.App. 174, 231 S.W. 1040; Raulston v. Mutual Ben. Health & Accident Ass'n, 22 Tenn.App. 101, 118 S.W.2d 881, 885."

The interpretation of this word "maintained" as given in the Paddock case was followed in Le John Manufacturing Company v. Webb, supra, with the following additional comment:

"In our view, a restrictive approach of this sort is necessary in order to prevent the excepting clause from utterly defeating the purpose and effect of the warranty itself." 222 F.2d at page 51.

In Reynolds v. Goodwin-Hill Corporation, 2 Cir., 154 F.2d 553, 555, Judge Learned Hand has this to say concerning the exception:

"The purpose of the section is reasonably plain: the payment of contingent fees was permitted when made to an agent employed generally to drum up business for the contractor, presumably because it was thought wise to allow contractors to do business in their accustomed way, in spite of the possibility that the inducement of a commission might on occasion result in abuses. But it was also thought that to employ persons to procure specific contracts upon a contingent fee, was likely to result in selecting those who had, or were supposed to have, some especial access to officials; and that this could not be tolerated."

That statement was challenged in a later case as unsound and unnecessary to the decision, but the court reaffirmed its position in these words:

"It is true that the pronouncement as to the employment of an agent to procure specific contracts upon a contingent fee was a dictum

but we still think it was a correct interpretation of the Executive Order. The exception creates a privileged class who may receive contingent fees for securing government contracts, while others may not. Not only should grants of special privileges be jealously restricted, but such a restriction is also in the interest of maintaining the integrity of governmental contracting procedure. Moreover, the use of the words 'Maintained by the contractor' suggests an intention to restrict the exception to continuing relationships between the contractor and his agent. The contract alleged in the complaint violates the public policy declared in the Executive Order." Bradley v. American Radiator & Standard San. Corp., supra, 159 F.2d at pages 40–41.

The most recent case found on this subject comes from the Court of Appeals for Kentucky, in Vogt Brothers Manufacturing Co. v. Stansbury, 304 S.W.2d 787. Under the facts of that case, the court held the manufacturer's agent met the requirements of the exception to contingent fee contracts. The court based its decision upon the requirements of certain Regulations in 44 C.F.R. §§ 150–150.13, the same Regulations to which the quoted portion of the bid form in the present case made reference. The facts of that case, however, are quite unlike those in the present controversy. The Kentucky court found that the agent

"maintained a thorough' and current knowledge of Vogt Brothers' plant and its operations. He kept informed as to products in which they were interested, and endeavored to obtain for them subcontracts from other contractors, as well as prime contracts directly with the Air Force. He had maintained a relationship with Vogt Brothers over a considerable period of years."

The plaintiff in this action, however, did not keep himself informed of the products and business of the defendant,

as discussed earlier in my Findings of Fact, and there was no continuity of relationship between plaintiff and defendant.

Applying the law as enunciated by the foregoing authorities to the facts of the case at bar, I hold that plaintiff does not qualify as a bona fide established commercial or selling agency maintained by the defendant for the purpose of securing business. Plaintiff may have been "maintained" by Hinkle Brothers, but most certainly he was not "maintained" by this defendant when the only time he had any contact with the defendant was to assist in obtaining these two Government contracts through a single bid. Plaintiff's only efforts in assisting defendant were with respect to one isolated instance, without any past or contemplated future employment, and a contingent fee in this type case is precisely the thing the statute and Executive Orders were intended to stop.

 Plaintiff has testified that he exerted his efforts in obtaining these contracts for defendant assuming that he would be paid by defendant just as previously and subsequently he had been paid for similar work by Hinkle Brothers. However, merely rendering services for a party does not give rise to an implied contract. See an annotation in 54 A.L.R. 548, giving numerous cases where work was performed at the request of, or with the acquiescence of, the recipient, yet the circumstances surrounding the rendering of the service repelled any inference of an agreement to pay for the work. Plaintiff has not here shown by a preponderance of the evidence that his services were accepted by the defendant under such circumstances as to constitute an implied contract, for plaintiff has not shown any acts of the parties or any circumstances which, "according to the ordinary course of dealing, and the common understanding of man, show a natural intent to contract." Woodruff v. New State Ice Co., 10 Cir., 197 F.2d 36, 38.

One further contention of plaintiff should be mentioned. It is true that there is no evidence here of any use of "influence" on the part of plaintiff to obtain these contracts. However, the courts have been explicit in their decisions that nothing sinister need be shown in order to invalidate a contract for contingent fees as a violation of public policy. See Le John Manufacturing Company v. Webb, supra, 222 F.2d at page 51:

"But in any event it is clear that actual evidence of improper conduct is not necessary to render such agreements unenforceable: 'The law looks to the general tendency of such agreements; and it closes the door to temptation, by refusing them recognition in any of the courts of the country.' Tool Co. v. Norris, 1864, 2 Wall. 45, 56, 69 U.S. 45, 56 [17 L. Ed. 868]."

The Court finds that no valid, enforceable implied contract existed between these parties upon which plaintiff can recover, and that the action must be dismissed. Counsel may prepare an order in accordance with the views expressed in this opinion.