348 F.2d 33
 VALDESA COMPANIA NAVIERA, S.A. as Owner of the MOTOR TANKER CAPE ARAXOS, (Libellant),
v.
FROTA NACIONAL de PETROLEIROS and Petroleo Brasileiro, S.A., (Respondents) Appellants.
 No. 15100.
 United States Court of Appeals Third Circuit.
 Argued April 20, 1965.
 Decided July 13, 1965.
 
 Morris Rosoff, Irving Fox, Rosoff & Rosoff, New York City, and Nathan Cholodenko, Newark, N. J., for appellants.
 John B. Applegate, Schroeder & Applegate, Hoboken, N. J., and William A. Wilson, Pyne, Smith & Wilson, New York City, for appellee.
 Before McLAUGHLIN, STALEY and SMITH, Circuit Judges.
 STALEY, Circuit Judge.
 
 
 1
 The M/T Cape Araxos ran aground in June and September, 1960, in the harbor of Rio de Janeiro. The ship, which was owned by Valdesa Compania Naviera, S.A. ("owner"), was engaged in shipping certain petroleum products under charter party to Frota Nacional de Petroleiros ("charterer"), the agent of Petroleo Brasileiro, S.A. The owner has brought this suit against the charterer in the District Court for the District of New Jersey for damages allegedly caused by the groundings.
 
 
 2
 The libel alleged that respondent charterer was liable for breach of a warranty in the charter party which required it to discharge at any safe place or port provided that the vessel can proceed thereto "or so near thereto as she may safely get always afloat." The district court, rejecting an argument that the groundings had been caused by the unseaworthy condition of the ship, found the charterer liable in the amount of $45,799.27 with interest and costs. On this appeal it is contended that the court's determination that the charterer was responsible for the groundings is not supported by the evidence, that the court abused its discretion in refusing to admit certain items of evidence, and that the damages awarded were excessive. We find the appellant's arguments unpersuasive except as to damages; we, however, find the award of damages excessive and are compelled to reverse the judgment below as to damages and remand for a new trial limited to that issue.
 
 
 3
 The charterer first contends that the determination of the trial court that it was responsible for the groundings is not supported by the evidence. The standard to be applied on appeal regarding a determination of this sort is that set forth in McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954). We may, therefore, disagree with the district court's determinations of fact only if they are "clearly erroneous," that is, "when `"although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed."'" Id. at p. 20, 75 S.Ct. at p. 8.
 
 
 4
 In the district court neither side disputed that the accidents had occurred. The owner claimed that the groundings were caused by the inadequate handling of the vessel by the pilot. The charterer denied improper handling and contended that the ship ran aground when certain ropes which ran from the ship to its accompanying tugs parted. The charterer sought to prove that the ropes were mended and shredded and that the ship was consequently unseaworthy.
 
 
 5
 The captain's testimony tended to show that the accident had happened when the pilot had tried to berth the ship when the tides were unfavorable for such a maneuver. According to the captain, some ropes by which the ship was connected to tugs assisting its berthing maneuver broke as a result of the grounding. The pilot's testimony was essentially that the grounding was caused by the breaking of the ropes which were in very poor condition. The ship's bell book, in which a constant account was kept of the changes in direction and the extent of engine power in use, tended to support the captain's testimony. This, then, is simply a case in which the court, having studied the testimony of two contradictory witnesses, has determined to believe one and disbelieve the other. As the testimony of the captain which the district court chose to believe is not so unworthy of belief as to leave us "with a definite and firm conviction that a mistake has been committed," we cannot disagree with the findings of the district court.
 
 
 6
 In making its findings of fact, the district court remarked that it was impressed with the demeanor of the captain on the witness stand and indicated that his presence gave weight to his testimony. It was implied in the appellant's brief that there was something unfair about this since the testimony of the pilot, which was presented in evidence in the form of a deposition, necessarily could not have had the same effect. There is clearly no merit in this point. It is obvious that the failure of one party to bring its chief witness into court does not require the court to deprive itself of the benefits of confrontation with the Chief witness for the other side.
 
 
 7
 It is next contended that the district court abused its discretion in refusing to admit certain evidence of foreign statutes, which, it is alleged, would have been determinative of the case. The matter was first brought to the attention of the court at the pretrial conference held on October 1, 1963. At that time, proctors for the charterer indicated that they wished to amend the answer to include a defense which they contended would be sufficient under Brazilian law and would be binding on the court under ordinary conflict of laws rules. The court required the proctors to furnish a memorandum to the court and their opponents setting out the particular provisions of Brazilian law that they deemed to be applicable, together with a discussion of the reasons for their applicability. This was to be done by October 15, 1963. No objection was made then or later that the time allowed for preparation of the memorandum was insufficient. On the information that the lawyer who was originally to handle the matter was ill, several postponements of the date for submission of this memorandum were obtained over increasing objection from the proctors for the owners. The trial was not in fact held until March 1964. At each of the hearings on motions to extend the trial date, counsel was asked why the required memorandum had not been prepared. In each case, the court was assured that it would be presented in a few days. It was furnished on February 10, 1964. The memorandum contained the text of Article 138 of the Regulations for Captains of the Port of Rio de Janeiro, which is as follows:
 
 
 8
 "Article 138 — The Master of a National or foreign vessel, within 24 hours after the vessel has entered (the harbor), will go to the Port Authority to inform of his entry, recording his statements in the proper book.
 
 
 9
 "Paragraph 1. — If in the course of the voyage immediately prior to his call any of the hypotheses listed below occur, the Master will deliver to the Port Authority an extract duly authenticated, of the statement that he has recorded in the Log Book:
 
 
 10
 "a. any damage to the vessel or to the cargo;
 
 
 11
 * * * * * *"
 
 
 12
 On the opening day of the trial, counsel was asked what he hoped to prove with respect to Article 138. He answered that Brazilian law provides that the sole determiner of the facts of maritime accidents is the Maritime Tribunal and that those facts are the only ones which may be used in a Brazilian court when suit for damages is brought. The following colloquy then took place between the court and the charterer's proctor:
 
 
 13
 "The Court: Just a moment. Aside from any effect that that might have I do not find in any regulation that you have cited anything of that nature.
 
 
 14
 "Mr. Fox [of proctors for Charterer]: If your Honor please, I believe this is correct. Your statement is quite probably correct. We have here with us from Brazil a Brazilian lawyer who is prepared to testify as an expert on Brazilian law. I believe that the only section of the Act that was cited in the trial memorandum filed with you was Section 138. I believe that was the section involved.
 
 
 15
 "The Court: Well, all I see that would bear upon this point — —
 
 
 16
 "Mr. Fox: I have since discovered that Article 18 of the provisional constitutional provisions of September 18, 1946 hold as follows: The decision of the Maritime Tribunal as to the technical subject concerning the accident and the facts of navigation constitute evidence.'
 
 
 17
 "The Court: Are you reading from a regulation? "Mr. Fox: I am reading from a translation of a Brazilian regulation and the law.
 
 
 18
 "The Court: Well, I don't care whether it is a translation or not. Are you reading a regulation?
 
 
 19
 "Mr. Fox: Yes. This is a constitutional provision of Brazil.
 
 
 20
 "The Court: Why wasn't this brought to my attention before?
 
 
 21
 "Mr. Fox: If your Honor please, again the Brazilian attorney with the expert knowledge of Brazilian law arrived in this country only some four days ago, at which time I questioned him closely as to various facets of the Brazilian law, and he has quoted to me this particular section, which I believe is the determinative of this action in this court. I believe, sir, that this should have been brought to your attention — —
 
 
 22
 "The Court: I am working on another point right now. This matter was pretried on October 1, 1963. Each of counsel received a copy of the pretrial order so there would be no misunderstanding as to what happened at the pretrial conference. This question of regulations of Brazil that might be applicable to this suit was raised then and counsel were directed — or rather counsel for respondent was directed to furnish the Court with a copy of the regulations and such law as might be applicable thereto, which would be pertinent to the issues here. So far I have Article 138. Article 130 is cited but I don't even see that that has any remote — —
 
 
 23
 "Mr. Fox: I agree, sir.
 
 
 24
 "The Court: I have Article 138. What are you asking me to do, to sit here and find out as we go along piecemeal what this law is when ample opportunity was available to bring that to the attention of the Court? Also give your adversary an opportunity to know what it has to meet, what about that?
 
 
 25
 "Mr. Fox: If your Honor please, everything you have said is precisely correct. This particular provision of the law was not called to the attention of counsel for the respondent until some four days ago. I regret to state. We have been told and we have a translation of this law. We have here a Brazilian legal expert to testify. If your Honor can see his way clear to accepting evidence in regard to this particular section of Brazilian law, which I believe is determinative of the question, and should have been brought to your attention and to the attention of counsel for the libelant — —
 
 
 26
 "The Court: And now you have it before you and you are reading. You were here yesterday. I assume that you must have had it yesterday.
 
 
 27
 "Mr. Fox: Yes, sir.
 
 
 28
 "The Court: I go out of my way to work evenings and off hours to understand what is coming before me so that I can do my part of the job for the litigants. I don't care about this kind of practice."
 
 
 29
 This whole record demonstrates clearly that charterer's proctors were so dilatory as to exhaust the abundant patience of the very able trial judge. The provision of Brazilian law by which the charterer sought to raise an extremely sophisticated issue of conflict of laws was presented to the trial court only on the first day of the trial. As the proctors for the owner would certainly have to have been given an adequate opportunity to meet the contention and obtain their own expert witness, another delay in the trial would have been required. Even at this time, no articulate, understandable explanation of the assertion that Brazilian procedural law was binding on the court was made. In these aggravated circumstances and to prevent continuing prejudice to the rights of the owners, it is clear to us that the trial court was well within its discretion in declining to receive the evidence. Such strict enforcement of pretrial orders has been upheld by this and other courts on numerous occasions. Payne v. S. S. Nabob, 302 F.2d 803 (C.A.3, 1962); S. Riggi & Son Construction Corp. v. Frouge Construction Co., 345 F.2d 654 (C.A.3, 1965); Fernandez v. United Fruit Co., 200 F.2d 414 (C.A.2, 1952); Cummins Diesel Michigan, Inc. v. The Falcon, 305 F.2d 721 (C.A.7, 1962); Olson, Admx. v. Shinnihon Kisen K. K., 25 F.R.D. 7 (E.D.Pa.1960).
 
 
 30
 Even if we did agree that the district court abused its discretion, our result would not be different. It seems highly doubtful that the district court would be required to set aside its factfinding procedures because Brazil has chosen to require that the facts be found for purposes of Brazilian judicial administration in a certain way. We find no need, however, to reach this difficult question, as it is clear that American law was applicable here. The rule for the interpretation of contracts in admiralty is still that set forth in Liverpool & Great Western Steam Co. v. Phenix Ins. Co., 129 U.S. 397, 453, 9 S.Ct. 469, 476, 32 L.Ed. 788 (1889):
 
 
 31
 "* * * [C]ontracts are to be governed, as to their nature, their validity, and their interpretation, by the law of the place where they were made, unless the contracting parties clearly appear to have had some other law in view."
 
 
 32
 Siegelman v. Cunard White Star, Limited, 221 F.2d 189 (C.A.2, 1955). See Jansson v. Swedish American Line, 185 F.2d 212 (C.A.1, 1950). In this case, however, the result is the same if we apply the general rule or the exception. There is ample indication that if the parties had any specific intention as to governing law, that intention referred to the place of signing, the United States. Although one of the signatories of the charter party was a Greek corporation and the other Brazilian, the charter party was agreed to and signed in New York and written in the English language. The agreement was arranged through a New York shipping agent; the charter makes a number of specific references to American law. While there are ample factors indicating that the parties intended American law to be applicable, there are virtually no indications of a contrary intention. Brazil enters the transaction only as the termination point of the voyage; it is, therefore, not even the sole place of performance.
 
 
 33
 It is next contended that the trial court abused its discretion in refusing to admit into evidence a certain chart purportedly indicating soundings which had been made in the area of the harbor of Rio de Janeiro in which the pilot attempted to berth the Cape Araxos. The record shows that a witness was questioned about the chart in an attempt to have it properly identified. He was unable to do so. The record does not reveal any renewal of the offer of the chart nor any ruling of the court rejecting it. In any case, as it is clear that no proper foundation had been laid for its introduction, the district judge would have been well within his discretion in rejecting it.
 
 
 34
 The district court awarded $45,799.27 to the owner, including the following amounts:
 
 
 35
 (A) Expenses incurred by
 reason of the June 17,
 1960 grounding $ 566.86
 (B) Expenses actually incurred
 as a result of
 the grounding on September
 23, 1960 11,388.25
 (C) Expenses to be incurred
 as a result of that
 grounding (for deferred
 repairs) 24,349.00
 (D) Loss of profits and
 costs 9,494.16
 
 
 36
 Conclusions A and D are not challenged here. The following elements of B and C are:[1]
 
 
 37
 (a) The allowance of $11,388.25 without reduction for the value of the annual drydocking of the Cape Araxos; (b) the allowance for the cost of temporary and permanent repairs to the propeller: it is contended that a causal connection between the grounding and the damage to the propeller has not been proved; and (c) the allowance of $5,000 for butterworthing and $9,000 for gas-freeing for hot work: it is alleged that the first is unproved and the second duplicates the first.
 
 
 38
 (a) In the normal course, the Cape Araxos was drydocked and inspected each year in a manner identical to the drydocking and inspection given at Curaçao. The charterer contends that the damages for the stay at Curaçao should be reduced by the expense of an annual drydocking. The testimony indicated that the ship was to be drydocked in the normal course in March 1961. The Curaçao drydocking was in October 1960. It is evident then that the next drydocking of the Cape Araxos could have been postponed until October 1961 at a substantial saving to the owner. It is clear that the district court failed to take this into consideration. The damages must, therefore, be reduced by the amount saved by the postponement of the next drydocking from March to October 1961.
 
 
 39
 A further reduction of damages seems likewise appropriate. The Curaçao drydock was able to handle only limited work, and some of the necessary repairs were deferred. An award of $24,349 was made for these repairs which includes amounts which are normal expenses for drydocking and inspection. The deferred repairs had not been made by the time of trial, and it seems clear that the ship could be operated without them. In view of this, there is no reason why the repairs could not be made at an annual drydocking. It is clear that the charterer is being charged for a drydocking and inspection that would take place in the normal course. Thus, the $24,349 element of the award must also be reduced by the amount of an average annual drydocking.
 
 
 40
 It is obvious, in addition, that the amount of profits and costs awarded for days lost in Curaçao and in the later drydocking for deferred repairs must be reduced for any days that would have been lost by the annual drydocking.
 
 
 41
 (b) At Curaçao temporary repairs were made to the ship's propeller. Other repairs were, of necessity, deferred. The court allowed all claims for these expenses, actual and contemplated. It is contended that the finding of a causal relation between the grounding of the ship on September 23, 1960, and the damage to the propeller was clearly erroneous. Charterer's expert witness did testify that the damage discovered at Curaçao was extremely unlikely to have resulted from an accident which happened as described. But no more than a hint of any other cause was suggested; it was only suggested that there could have been another cause either before the grounding or during the trip from Rio de Janeiro to Curaçao. In the face of testimony that the propeller while sunk in the sand at Rio de Janeiro had been used in an attempt to free the ship from the strand and the testimony of the plaintiff's expert that the damage could have been caused in this fashion, the court accepted the more likely explanation. This is obviously not "clearly erroneous."
 
 
 42
 (c) Finally, it is suggested that the court allowed two unproved and duplicate expenditures. As indicated previously, after the grounding, the ship proceeded from Rio de Janeiro to Curaçao. During that voyage, the ship's tanks were butterworthed by the crew, that is, cleaned with a special machine utilizing high-pressure and high-temperature water to make it safe for repair work. The charterer produced precise testimony at the trial indicating that the value of this work was $1,749. The owner originally asked for $5,000. The court apparently accepted the latter figure.[2] In any case, we conclude that the acceptance of the $5,000 figure was clearly erroneous. The charterer's expert analyzed the $1,749 figure into each of its component parts in a highly precise and persuasive fashion.
 
 
 43
 In the deferred expenses, the district court allowed $9,000 for gas-freeing for hot work. The owner's expert testified that this process is different from butterworthing in that it comprehends not only the cleaning of the tanks by special machines, but the manual removal of sediments, scale and other debris. This work is necessary to prepare a vessel for "hot work." Specially trained labor must be used to do the manual part of the preparation. The charterer's expert's testimony might be interpreted as saying that the cost of the two processes was the same. But no attempt was made to have him distinguish between the processes. In the circumstances, it was not clearly erroneous for the trial court to accept the testimony of the owner's expert.
 
 
 44
 Neither can we accept the suggestion that by allowing $5,000 for butterworthing and $9,000 for gas freeing, the court is allowing the same expense twice. Butterworthing was necessary for the work at Curaçao. At Curaçao, however, not all of the necessary repairs could be made, and some had to be deferred. For the deferred repairs, gas freeing will be necessary. The consequences of the unavailability of more extensive facilities at Curaçao cannot be charged to the owners. The expense must, therefore, be allowed.
 
 
 45
 The cause will be reversed and remanded for a new trial limited to damages, to be conducted in accordance with this opinion.
 
 
 
 Notes:
 
 
 [1]
 The district court indicated only the four totals given above in its findings of fact. It would have been very helpful in this analysis if the figures from which these totals were derived had been specified in the findings of fact
 Proctors for the appellants were less than fully helpful to this court when they failed to specify in their brief the amounts by which they thought the damages must be reduced.
 
 
 [2]
 The court's failure to specify the items which go to make up its totals again makes it difficult to determine whether or not this is true