**S.E.L. MADURO (FLORIDA), INC.**

v.

**M/V SANTA LUCIA, Her Engines, Tackle, Apparel, Etc., In Rem, Seatrade Groningen, B.V., In Personam.**

**Civ. A. No. 85–0979–MA.**

United States District Court, D. Massachusetts.

June 17, 1987.

Neal A. Rosen, Thomas H. Walsh, Jr., Carol J. Paquin, Bingham, Dana & Gould, Boston, Mass., for plaintiff.

Astrid C. Glynn, Glynn & Dempsey, P.C., Andrew F. Lane, Gaston Snow & Ely Bartlett, Boston, Mass., for M/V Santa Lucia.

Donald F. Mooney, New York City, for Spitsbergen Shipping Ltd.

## MEMORANDUM AND ORDER ON DEFENDANTS' AND CLAIMANT'S MOTION TO AMEND AMENDED ANSWER (# 111)

ROBERT B. COLLINGS, United States Magistrate.

The issue in this case is whether or not the defendants shall be permitted to amend their answer to add a defense that the stevedoring contract upon which plaintiff seeks to recover is void and unenforceable as against public policy.

The underlying facts involve four entities. These are the plaintiff, S.E.L. Maduro (Florida), Inc. (hereinafter "Maduro"), Beaufort Navigation, Inc. (hereinafter "Beaufort Navigation"), Beaufort Terminals, Inc., a subsidiary of Beaufort Navigation (hereinafter, "Beaufort Terminals") and Comercializadora Multinacional De Banana, S.A. (hereinafter, "Comunbana"). The term "Beaufort" will be used to denote both Beaufort Navigation and Beaufort Terminals collectively. Maduro in this action seeks to enforce a maritime lien against the defendant vessel on account of unpaid stevedoring services. The vessel was arrested while it was at Gloucester, Massachusetts; it has subsequently been released upon the posting of a bond. At the time the stevedoring services were rendered, the vessel was chartered to Beaufort Navigation by its former owners; the vessel is currently owned by the defendant Seatrade Groningen, B.V.

On April 29, 1981, Beaufort Navigation, acting as agent for Comunbana and another, entered into a stevedoring contract with Maduro for the unloading of bananas and plantains at Port Everglades, Florida. The

contract provided for a charge for the stevedoring services of 48 cents a box.

A "rider" to the stevedoring contract was signed the same day providing that three cents of the 48 cents would be paid to Maduro to amortize equipment which it had to purchase to handle the offloading of the bananas and plantains so that the vessels could be unloaded using two gangs simultaneously. Beaufort Navigation guaranteed to pay Maduro the unamortized amount of the purchase price of the equipment if the contract was cancelled.

Lastly, on April 29, 1981, Leo McKay, then President of Maduro, wrote a letter to Beaufort Terminals which reads as follows:

S.E.L. MADURO (FLORIDA), INC.

P.O. BOX 011470

MIAMI, FLA. 33101

April 29, 1981

BEAUFORT TERMINALS, INC.

P.O. Box 4365

San Pedro, CA. 90731

Dear Sir:

Please refer to the general cargo stevedores contract between S.E.L. Maduro Florida, Inc. and Beaufort Navigation, Inc. as agents of Comunbana.

Not withstanding the rate included in Clause # 1. It has been mutually agreed that Maduro will be compensated at a rate of $0.42 per box of bananas and/or plantains.

Such rates are predicated on the existing contract between management and International Longshoreman Association in the Port Everglades. All other terms and conditions of the above-mentioned contract are unchanged.

Please sign the attached copy of this letter and acknowledge agreement to the above mentioned understanding.

Very truly yours,

S.E.L. MADURO (FLORIDA) INC.

/s/ Leo A. McKay

Leo A. McKay

President.

In handwriting at the bottom of the letter appears the following:

Acknowledged

J. Gredsted

President

By their motion, defendants seek to add the following defense based on the McKay letter:

AND FURTHER ANSWERING, and as a complete and separate defense, the defendants and claimant say upon information and belief, that the plaintiff offered, gave and agreed to give to Beaufort Navigation Inc. (hereinafter "Beaufort") (or its wholly-owned subsidiary Beaufort Terminals Inc.) monies and things of value with intent to influence Beaufort, to procure plaintiff's employment as a stevedore for Beaufort's principals, and to obtain a stevedoring contract, dated April 29, 1981, between plaintiff and Beaufort's principals, which contract was signed by Beaufort on behalf of its principals, and that the foregoing acts of plaintiff and the stevedoring contract upon which plaintiff's claim is based are unlawful, illegal, unenforceable, contrary to public policy, and are contrary to the law and public policy of the Commonwealth of Massachusetts, including Section 271:39 of the General Law of Massachusetts, and constitute a crime.

In essence, the defendants claim that the McKay letter represents an illegal kickback to Beaufort Navigation, through its subsidiary, for obtaining the contract. In other words, defendants charge that the 42 cents a box price was the price which represented the true value of the services but that Maduro engaged in a joint venture with Beaufort Navigation and/or Beaufort Terminals, which was unknown to Comunbana, to charge Comunbana 45 cents per box with the three cent difference going to Beaufort Navigation and/or Beaufort Terminals. Such an arrangement would indeed be against public policy and a breach of Beaufort Navigation's fiduciary duty as an agent to its principal, Comunbana. A Court would not enforce such a contract.

Needless to say, the plaintiff vigorously denies defendants' characterization of the McKay letter. However, the problem for the Court is that on the record before me, there does not appear to be any satisfactory explanation for the letter and, in fact, considerable question as to exactly what was being done and the extent, if at all, that Comunbana's representatives knew and/or approved of the arrangement.

The stevedoring contract was negotiated in San Francisco. So far as appears, the negotiators were Mr. McKay and Captain Robert E. Cleveland of Maduro, George Nazarri and Captain Jorgan Gredsted for Beaufort Navigation, and Gerardo Sattler of Comunbana. Of these, only Mr. McKay, Captain Cleveland and Mr. Nazarri have been deposed.

The plaintiff filed an Affidavit Of Leo McKay (# 88) on October 1, 1986. In the affidavit, Mr. McKay asserts that the 48 cent price was negotiated between himself, Mr. Sattler, Captain Gredsted and Mr. Nazarri. He refers to three cents of the 48 cent price going to amortize equipment but does not state whether or not Mr. Sattler was aware or agreed to this. With respect to his April 29, 1981 letter, Mr. McKay stated:

> Prior to the Comunbana banana/plantain operation, Beaufort, as general agent for various principals engaged in refrigerated cargo transportation, had appointed Maduro as sub-agent and as stevedoring contractor in Florida for fresh fruit and frozen concentrates. Concurrently, and again prior to the Comunbana banana/plantain operation, Beaufort, with offices in San Francisco and San Pedro, California, had represented Maduro on the West Coast as sub-agent and promotional representative. For these services, Maduro compensated Beaufort with fees calculated on tonnage or box rates on business generated on Maduro's behalf by Beaufort. This was an informal arrangement, subject to change or cancellation at any time, and was memorialized in this case in an April 29, 1981 letter agreement between Madu-

ro and Beaufort ... Under the terms of the letter agreement, which was addressed to Beaufort Terminals, Inc., the .48 [cent] per carton commodity rate, less .03 [cents] per carton for equipment amortization and .03 [cents] per carton for promotional fees to Beaufort, left Maduro with a net compensation of .42 [cents] per carton.

Mr. McKay goes on to state that Beaufort would not receive the three cents per carton for promotional fees unless Beaufort invoiced Maduro separately for these fees. Beaufort did invoice Maduro for the fees in the initial stages of the operation, "... but did not receive payment because the Comunbana banana/plantain contract was not considered to be an effective bench mark for Beaufort promotional fees, in part because production levels turned out to be far lower ..." than were projected when the contract was negotiated.

In his deposition, Mr. McKay, although acknowledging signing the letter, stated that the agreement was between Captain Cleveland of Maduro and Captain Gredsted of Beaufort. He claimed that he delegated the responsibility of negotiating the stevedoring contract to Captain Cleveland. However, Captain Cleveland, in his deposition, denied ever seeing the letter. Mr. Nazarri testified that Beaufort Terminals had an understanding with Maduro and other stevedoring companies "... that there would be compensation to Beaufort Terminals for bringing business to them" but did not have any explanation for the specific agreement in the letter. Mr. Nazarri denied that Beaufort ever represented Maduro on the west coast, thereby contradicting Mr. McKay's statement in his affidavit that Beaufort represented Maduro on the west coast. The defendants allege that at a later deposition, Mr. McKay admitted that Maduro did not have business on the west coast and, in effect, refused to answer any further questions respecting his affidavit, answering each question with the statement "the paragraph speaks for itself" when asked about the basis for his statements and a specification of the promotional services allegedly performed by Beau-

fort for Maduro for which the three cents a box was compensation.

In addition, when defendants requested copies of the invoices which Beaufort Navigation sent to Maduro billing Maduro for three cents a box, Maduro replied that there were no such documents within its custody, control and/or possession.

In sum, there does not appear to be a satisfactory explanation for the McKay letter. If the payment was a commission to Beaufort Navigation for bringing the Comunbana business to Maduro, the obvious question is why the arrangement was not spelled out in the contract. There is no problem with Maduro paying a commission to Beaufort out of its profits, but if Beaufort Navigation as agent for Comunbana, in collusion with Maduro and unknown to Comunbana, deliberately negotiated a higher price which Comunbana had to pay so that Beaufort would receive three cents a box, the agreement would be unenforceable as against public policy.

Maduro claims that "[n]o such conduct has been demonstrated on the record to date, and allowance of movant's motion to add the defense would be futile." In a footnote to the first part of that sentence, counsel for Maduro states that "[i]ndeed, each of the witnesses movants have deposed roundly denied any kickback or commercial bribery scheme, or, indeed, even that any lawful sharing of profits occurred" and directs the Court's attention to portions of Captain Cleveland's deposition and Mr. McKay's deposition. Opposition, Etc. at p. 26. Counsel's statement is somewhat of an exaggeration. Captain Cleveland denied any knowledge of the McKay letter and stated that there was no kickback "that I know of" or "to my knowledge" and that if there was one, he "... wouldn't have had to have known about it." Cleveland deposition, pp. 63–4. As indicated, all Mr. McKay denied at the referenced pages was that Maduro ever engaged in kickback practices between management and union officials which might be the subject of an investigation by the Waterfront Commission. McKay depo-

sition, pp. 359–60. However, he was singularly unresponsive when counsel sought to probe the specific statements in his affidavit which purported to justify the three cent per box payment to Beaufort Terminals.

On the record presently before me, I cannot say that the defendants should be precluded from raising the defense because of futility or that further discovery directed at the defense is unwarranted on the ground that there is no possibility that the defense would succeed.

Relying on *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) and *Vargas v. McNamara*, 608 F.2d 15, 18 (1st Cir.1979), Maduro opposes the motion to amend on several grounds other than futility. These are: first, that the delay in filing the motion was deliberate and inexcusable and second, that the plaintiff would be severely prejudiced if the motion were to be allowed.

The plaintiff's argument that the motion to amend comes late in the day, at least facially, is well taken. The original complaint in this action was filed on March 7, 1985 and first allowed to be amended on March 15, 1985. The defendants' and claimant's answer was filed on May 10, 1985, with a counterclaim being filed on April 3, 1986. After the discovery cutoff was extended from July, 1986 to August, 1986 on joint motion of the parties, the plaintiff filed a motion to amend the amended complaint in June, 1986 which was allowed in October, 1986. The second amended complaint was not served until December, 1986, after which, on January 7, 1987, the answer of claimant and defendants to the plaintiff's second amended complaint and counterclaim of claimant was filed. An amended answer adding five additional affirmative defenses was filed on January 22, 1987. Discovery closed on February 15, 1987 and the case was scheduled to be called for trial assignment before the district judge on the March 1987 trial list. Upon consent of the parties, this case was referred to the undersigned for all further proceedings and the entry of

judgment in accordance with 28 U.S.C. § 636(c) on February 20, 1987. The instant motion to amend the amended answer was filed on March 6, 1987.

The defendants contend that in reciting the procedural background the plaintiff has colored the facts to paint a picture of inordinate delay that in some particulars is not valid. The Court is, of course, well aware that counsel, as advocates, present facts in a manner most advantageous to their own respective positions. However, some facts cannot be disputed. The proposed amended answer would constitute the third answer of the defendants since the second amended complaint was considered served in December of 1986. At the time the motion was filed, discovery had been completed and the case would have been assigned for trial had it remained with the district judge. The primary documentary evidence upon which the defendants rely in raising the defense had been in their possession for quite a period of time. For example, the stevedoring contract and Mr. McKay's April 29, 1981 letter were appended to the original complaint filed in this action. Moreover, arguing that the plaintiff would suffer no prejudice by the allowance of the instant motion, the defendants state

> ... As early as June 24, 1986, movants had served papers on Maduro's counsel claiming that the side letter agreement indicated that "Maduro was submitting invoices for an inflated charge with a built-in commission or kickback to Beaufort and abetting Beaufort in an apparent breach of its fiduciary agency relationship with Comunbana."

Memorandum In Support, Etc., # 112 at p. 14.

In addition, the defendants reiterated their position regarding the alleged kickback arrangement in answers to interrogatories served on February 11, 1987, prior to the deposition of George Nazzari, one of the depositions which defendants claim led to the request to amend their answer to add the defense. *See* Memorandum In Support, Etc., # 112 at p. 14. Thus, while the discovery undertaken in late January and early February of 1987 may, in the defendants' view, have fleshed out the defense they now proffer, there can be little doubt that the theory of the defense, as well as the fundamental facts underlying it, were known to the defendants well in advance of the time this motion to amend was filed.

■ Defendants argue that until Mr. Nazarri contradicted Mr. McKay's affidavit and testified that Beaufort Navigation did no promotional work for Maduro on the west coast, they could not, consistent with the requirements of Rule 11, F.R.Civ.P., seek to add the defense. This explanation for the delay is totally unconvincing. Rule 11, F.R.Civ.P., provides, in pertinent part:

> Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated.

> \*  \*  \*  \*  \*  \*

> The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

The Rule applies to *"every* pleading, motion and other paper"* filed in Court. On June 25, 1986, the defendants' counsel, Donald F. Mooney, Esquire, filed an Affidavit In Support Of Defendants' And Claimant-Owner's Motion For Partial Summary Judgment in which he averred, in pertinent part:

> Maduro made the stevedoring contract with Comunbana through Comunbana's agent Beaufort on April 29, 1981. On the same day, Maduro's President, Leo McKay, made a side agreement with Beaufort that while they agreed to

charge Beaufort's principal Comunbana $.48 a box, Maduro would only receive from Beaufort $.42 a box.

\* \* \* \* \* \*

It means that Beaufort retained a $.06 per box commission (12½% of the charge). It also means that Maduro was submitting invoices for an inflated charge with a built-in commission or kickback to Beaufort and abetting Beaufort in the apparent breach of its fiduciary relationship with Comunbana.

Affidavit, Etc. p. 18.

If defendants' counsel could, consistent with the requirements of Rule 11, F.R. Civ.P., make those statements in his affidavit in June 1986, the rule would not have barred him at that time from interposing the affirmative defense which he now seeks to add. Put another way, if the statement was "well grounded in fact" so as to support a motion for partial summary judgment, it was equally so for the purpose of adding a defense.

Although the Court is of the view that the proposed amendment comes late, it is mindful of the somewhat unique procedural circumstances of this case. The second amended complaint was served less than three months prior to the filing of the instant motion. Discovery was closed only two months after service of the second amended complaint. The affirmative defense could have been interposed in the answer to the amended complaint which the defendants filed on January 7, 1987, just two months before the defendants filed the instant motion seeking to add the defense.

Moreover, it does not appear that all the blame for the delay should be laid to rest at the defendants' doorstep. The circumstances surrounding the discovery involving Leo McKay serves as an example. As indicated *supra*, Mr. McKay filed an affidavit in October, 1986. The affidavit was presumably in response to the defendants' contention contained in Mr. Mooney's affidavit filed June 25, 1986 that the side letter reflected an illegal kickback arrangement. In his affidavit, Mr. McKay characterized

the three-cent differential between the contract price and the side agreement as a fee to Beaufort for promotional services to Maduro and claimed that Beaufort did, in fact, bill Maduro for three cents a box but Maduro did not pay the bill. Clearly the defendants were under no obligation to accept Mr. McKay's explanation on its face and had the right to test the veracity of those statements by taking additional discovery.

Plaintiff complains that this discovery should have been taken earlier. However, the plaintiff had noticed Leo McKay's deposition in June of 1986 so the defendants saw no need to notice his deposition separately. Discovery seems to have been in abeyance while plaintiff's motion to amend the complaint was pending. The defendants assert that they were not advised until December 19, 1986 that the plaintiff would not be taking Mr. McKay's deposition. The defendants promptly caused a subpoena to be served upon Mr. McKay and his deposition was taken shortly thereafter. As indicated *supra*, his responses to questions probing his affidavit were less than enlightening. With respect to the Beaufort bills to Maduro for three cents a box which were referenced by Mr. McKay in his affidavit, Maduro did not respond to the request for production until February 9, 1987, at which time it stated "no invoices concerning same are in plaintiff's possession, custody or control." Thus, the defendants' ability to marshall evidence to rebut the McKay affidavit was thwarted to some extent by the timing of the plaintiff's actions. Although it is evident that the defendants were cognizant of the legal grounds for the proposed defense much earlier than it was filed, the above-recited circumstances of this case aid the defendants in meeting their burden of demonstrating the reasons for their tardiness. *Hayes v. New England Millwork Distributors, Inc.*, 602 F.2d 15, 19–20 (1 Cir., 1979).

The issue of delay aside, the defendants' most compelling argument in support of their motion to amend is the nature of the proposed defense itself, i.e. the unenforce-

ability of the contract as against public policy. If this claim is viable, the Court should certainly not be placed in the position of enforcing a contract that is either illegal or contrary to public policy.

There can be no doubt that a contract to perform stevedoring services is a maritime contract, *International Stevedoring Co. v. Haverty*, 272 U.S. 50, 52, 47 S.Ct. 19, 19, 71 L.Ed. 157 (1926), and further that "[w]ith admiralty jurisdiction comes the application of substantive admiralty law." (citation omitted) *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 2299, 90 L.Ed.2d 865 (1986). The long-standing admiralty rule with respect to contracts is that they:

> ... are to be governed, as to their nature, their validity, and their interpretation, by the law of the place where they were made, unless the contracting parties clearly appear to have had some other law in view.

*Liverpool & Great Western Steam Co. v. Phenix Insurance Co.*, 129 U.S. 397, 453, 9 S.Ct. 469, 476, 32 L.Ed. 788 (1889). *See also Valdesa Compania Naviera v. Frota Nacional de Petroleiros*, 348 F.2d 33, 38 (3 Cir., 1965). In *Jansson v. Swedish American Line*, 185 F.2d 212, 218 (1 Cir., 1950), the Court of Appeals canvassed the law which is to be applied to a maritime contract in which there is no provision in the contract specifying the law which is to govern the contract. The Court wrote:

> ... where the contract contains no explicit provision that it is to be governed by some particular law, what the courts applying this intention test actually seem to do is to examine all the points of contact which the transaction has with the two or more jurisdictions involved, with a view to determining the "center of gravity" of the contract, or of that aspect of the contract immediately before the court; and when they have identified the jurisdiction with which the matter at hand is predominantly or most intimately concerned, they conclude that this is the proper law of the contract which the parties presumably had in view at the

time of the contracting. (citations omitted.)

*Id.* at 218–219.

Under this test, a contract between a California corporation and a Florida corporation, executed in California and performed in Florida, would not be governed by Massachusetts law. The plaintiff further argues that even if Massachusetts' pragmatic approach to choice-of-law questions is applied, the determinative considerations would not call for the application of Massachusetts law. *Bushkin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, 631–636, 473 N.E.2d 662, 666–671 (1985). Since the general laws of the Commonwealth are irrelevant, the plaintiff contends that the proposed defense is futile.

The defendants counter the plaintiff's argument by citing the position that:

> Federal courts give effect to the law and policy of the forum state regarding the enforcement of contracts, and will not enforce a contract made in another state and there valid, if the laws of the forum state declare such a contract to be against public policy....

1A Moore's *Federal Practice*, ¶ .311[1] at p. 3163 (2d Ed.1985). *See The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972). Massachusetts, the forum state, has a specific statute, 271 M.G.L. § 7, denoted a crime against public policy, which encompasses the plaintiff's actions as alleged by the defendants. The defendants assert that, if their proposed defense is proven, Massachusetts would not enforce the stevedoring contract upon which the plaintiff's claim is based as being contrary to public policy of the Commonwealth.

■ The necessity of deciding this choice of law question is obviated by my view that the conduct as alleged in the proposed defense is contrary to public policy in general. While neither Florida nor California has a distinct commercial bribery statute as does Massachusetts, both states have enacted public policy statutes concerning public officials with adverse or pecuniary inter-

ests which incorporate the same principles respecting public officials. *See* Title X, Florida Statutes Annotated § 112.311 and Title 7, Annotated California Codes, Chapter 1, § 92–100. Both the defendants and the plaintiff call the Court's attention to the Model Penal Code, § 224.8 and 18 U.S.C. §§ 201–224 which likewise penalize similar conduct. The American Law Institute Restatements of The Law universally condemn the actions alleged in the proposed amendment. *See* Restatement (Second) of Agency, §§ 312, 313; Restatement (Second) of Contracts § 193; Restatement (Second) of Torts, §§ 874, 876.

■ In sum, it is beyond doubt that commercial bribery clearly contravenes a strong public policy and that the Court, in the due administration of justice, cannot enforce a contract which is obtained by that means. *See Oscanyan v. Arms Co.,* 103 U.S. 261, 13 Otto, 26 L.Ed. 539 (1880); *Browne v. R & R Engineering Co.,* 164 F.Supp. 315, 317 (D.Del.1958). In these circumstances, the Court would have to be provided with a substantial basis for considering the defense frivolous before it could, in good conscience, refuse to permit an amendment stating the defense, even if the defense is tardy.

Therefore, I shall allow the defendants' motion. Counsel are directed to report for a further conference on *Friday, June 26, 1987 at 12:30 P.M.* at Courtroom # 8 (9th floor), John W. McCormack Post Office and Court House, Boston, Massachusetts to discuss a schedule for further discovery and whether or not the tentative trial date of July 20, 1987 can be held.

■ Because the defendants did delay unduly in bringing the motion, the expenses of any depositions which have to be re-taken will be borne completely by the defendants. As to depositions of persons who have not previously been deposed in this case but who will now have to be deposed because of the allowance of the motion to state the additional defense, the Court retains the right to apportion the expenses of the depositions as it deems just. However, further exploration of the future discovery needs of the parties at the conference will be necessary before a decision with respect to these expenses can be rendered.

For the foregoing reasons, it is ORDERED that Defendants' And Claimant's Motion To Amend Amended Answer (# 111) be, and the same hereby is, ALLOWED on condition that the defendants bear the costs of all depositions which have to be taken of persons who were previously deposed and that the defendants bear whatever proportion of the costs which the Court deems just which will have to be expended in order to depose persons not previously deposed who now will have to be deposed in view of the assertion of the additional affirmative defense.