**In re: K & B FOOD SERVICES,**
**Debtor,**

**K & B Food Services, Inc., Appellant,**

**v.**

**County of Mercer.**

No. 01–1243.

United States Court of Appeals,
Third Circuit.

Argued June 6, 2002.
Decided Dec. 12, 2002.

Jeremy Galton, (Argued), Plainsboro, NJ, and Arthur C. Linderman, Englewood, NJ, for Appellant.

Ashley Bostic–Hutchinson, (Argued), Office of County Counsel, Count of Mercer, Trenton, NJ, for Appellee.

Before SLOVITER, NYGAARD, and BARRY, Circuit Judges.

## OPINION

BARRY, Circuit Judge.

The long and torturous history of this case need not be recounted in much detail given that we write for the parties only, who are intimately familiar with what has gone before. Suffice it to say that extensive proceedings have taken place in the Bankruptcy Court, the District Court, and this Court over a period of many years. Those proceedings will now come to an end. In sum, we will vacate the order of the District Court insofar as that order found the contract at issue unenforceable and set aside the damage award ordered by the Bankruptcy Court and we will remand for entry of judgment in favor of appellant K & B Food Services, Inc. ("K & B") in the amount of $597, 849.00. The District Court had jurisdiction under 28 U.S.C. §§ 158(a) and 1334. We have jurisdiction pursuant to 28 U.S.C. §§ 158(d) and 1291.

## I. BACKGROUND

K & B was in the food preparation and catering business. In June 1991, it purchased and began operating Adelphia Restaurant, a pizzeria in Fairless Hills, Pennsylvania. This operation soon expanded to include catering to area businesses and to corporate air traffic at the Mercer County Airport in Ewing, New Jersey. As its catering business continued to grow, K & B began to search for a production facility. Given that the majority of its clients operated out of the Mercer County Airport, K & B approached appellee Mercer County about leasing space at the airport.

On September 24, 1992, K & B executed a written agreement with Mercer County to lease Building 31 at the Mercer County Airport for the purpose of establishing a flight kitchen and warehouse. The term of the lease was five years, beginning October 1, 1992 and ending September 30, 1997. In consideration, K & B agreed to pay Mercer County a six percent commission on all airport sales and a monthly rent of $844.96 during the first year with the amount increasing each year thereafter. In the event K & B defaulted on its obligations, Mercer County could cancel the lease provided it notified K & B in writing ninety days beforehand.

Almost immediately after the parties executed the lease, K & B fell behind in its monthly commission and rent payments. In early to mid–1994, several of K & B's checks were returned due to insufficient funds. Consequently, Mercer County initiated a landlord-tenant action in the spring of 1994, seeking payment of the overdue rent and commissions.[1] As of August 29, 1994, however, K & B had not paid the rent for July and August. As of September 16, 1994, K & B had not paid its electric bill in over sixty days, and the electricity was shut off.

In the spring and early summer of 1994, K & B began negotiating a contract with Local Railroad Company, Inc. ("Local R.R.") for the production and packaging of minihamburgers for sale in Local R.R.'s vending machines. On June 27, 1994, Local R.R.'s president, Gustav Homner, inspected K & B's facilities at Building 31 and viewed test runs of the burger production. Two days later, K & B and Local R.R. executed a written contract.[2] The contract provided that K & B was to produce Local R.R.'s line of Boxcar Burgers at the price of $0.696 per three-pack of burgers. Of that price, $0.185 constituted K & B's profit, overhead, and labor costs. Local R.R. was responsible for shipping costs. It was also required to place purchase orders at least biweekly for a reasonable amount of burgers. The contract's term was two years and, according to the parties, production was scheduled to begin on October 1, 1994.

During conversations between Assad Khoury, K & B's president, and Mr. Homner before Mr. Homner's visit on June 27, 1994, the parties agreed that Local R.R.'s weekly consumption under the contract would be 75,000 units. This figure was based on Local R.R.'s previous sales, which totaled about 300,000 in the six months before the contract's execution. Mr. Khoury confirmed the 75,000 figure and K & B's ability to produce that figure in a letter to Howard S. Danzig, Local R.R.'s chairman, sent the day after Mr. Homner's visit. After the contract was executed, Kalli Bliziotis, K & B's bookkeeper, telephoned Local R.R. to verify that 75,000 remained the correct production figure.

During their conversations, Mr. Khoury and Mr. Homner also discussed financiers and suppliers. Local R.R. agreed to supply K & B with its credit lines to purchase raw materials, such as meat, onions, and buns, if needed. Additionally, K & B had its own sources of credit. Ms. Bliziotis's father had lent K & B $20,000 in the past and agreed to lend $20,000 again for the Local R.R. contract. Similarly, friends of Mr. Khoury had lent K & B money in the past and made an oral commitment to provide approximately $15,000 for the Local R.R. contract. Mellon Bank, which lent K & B $250,000 for Building 31's renovation and for equipment, indicated a continued willingness to work with K & B. Both Mr. Khoury and Bill Bliziotis, K & B's vice president, were prepared to lend K & B money in the form of shareholder loans. Finally, K & B had a continuing source of income from its Adelphia Restaurant.

As for suppliers, K & B solicited bids from several companies to provide cardboard and packaging for the burgers. Ne-

1. The record is far from clear but it appears that the County voluntarily dismissed the action after receiving full satisfaction from K & B in May or June 1994.

2. Although the contract states that its execution date is June 29, 1994, Howard S. Danzig, Local R.R.'s Chairman, and Assad Khoury, K & B's President, did not sign the contract until July 14, 1994 and July 18, 1994, respectively.

gotiations with these companies occurred simultaneously with the negotiations between K & B and Local R.R. K & B and Local R.R. selected the James River Corporation to supply the packaging for the Boxcar Burgers on a purchase order basis. Other companies, such as Acme Paper & Supply Co., would supply additional paper products and corrugated cardboard.

In the months between the execution of the Local R.R. contract and the October 1st date on which production was scheduled to begin, K & B explored additional business opportunities. One such opportunity was a joint venture with Global Fare, Ltd. ("Global"), located in Flemington, New Jersey. As part of a trial period, K & B moved some of its equipment, including a pizza oven, stainless steel production table, and assembly belt, to Global's facilities the first week of August 1994. Meanwhile, K & B temporarily downsized its operations in Building 31 to reduce costs. Besides Mr. Khoury and Mr. Bliziotis, there was only one employee and the U.S.D.A. inspector at building 31 throughout the summer. By the end of August 1994, K & B abandoned the joint venture because Global's business style conflicted with K & B's.

K & B, however, left its pizza oven at Global so that it could be recalibrated to cook burgers for the Local R.R. contract, and intended to return the oven to Building 31 at the end of September before the contract performance was to start. Although K & B approached a company in Flemington to perform the recalibration, it did not execute a formal contract with that company. In the event that K & B needed machines to produce the burgers, Local R.R. was willing to provide its machines.

On September 16, 1994, K & B intended to begin preparing Building 31 for the Local R.R. contract. These preparations included realigning production tables and conveyor belts, changing the compressors' calibration, and stocking the facility with packaging and food supplies. Before K & B could make these preparations and before Local R.R. could place any orders, Mercer County dispossessed K & B from Building 31. Specifically, on September 16, 1994, airport security, County officials, and Ewing Township police prevented K & B employees, including Mr. Khoury, from entering and using the premises. When Mr. Khoury was finally permitted to conduct a quick, escorted walk-through of Building 31 later that evening, he observed that equipment and furniture had been disturbed and were no longer in their original places. Prior to that time, K & B had maintained the premises in an orderly and clean condition.[3] In the days following the lockout, K & B made several requests to County officials to enter the building but was consistently denied access. K & B never received written notice from Mercer County informing it of the lease's cancellation before the above actions were taken.

Without the use of Building 31, K & B's production was severely limited. K & B searched for other U.S.D.A. approved facilities in which to conduct its business but to no avail. On September 19, 1994, K & B filed a voluntary Chapter 11 bankruptcy petition in the U.S. District Court and, by reference, the U.S. Bankruptcy Court for the District of New Jersey. Six months later, it commenced an adversary proceeding against Mercer County for, *inter alia*, wrongful termination of the parties' lease and violation of the automatic stay provision in 11 U.S.C. § 362. After a protracted trial, the Bankruptcy Court held that Mercer County improperly terminated the

---

**3.** The resident U.S.D.A. inspector confirmed that the premises were clean and orderly through September 15, 1994. The inspector examined the facilities twice daily.

lease and violated the automatic stay provision. The Court awarded K & B $597,849.00 in damages for the former and $4,664.80 in attorneys' fees for the latter. Mercer County appealed to the District Court which vacated the $597,849.00 award after concluding that Mercer County properly terminated the lease. On K & B's appeal to this Court, the District Court's order was vacated and the matter was remanded.[4] On remand, the District Court determined that Mercer County wrongfully terminated the lease but that K & B suffered no damages. K & B has again appealed to this Court.[5] As we noted above, we will reverse.

## II. DISCUSSION

■ K & B argues that the District Court erred when it reversed the Bankruptcy Court which had concluded that K & B and Local R.R. executed a requirements contract for the weekly production of 75,000 three-packs of Boxcar Burgers beginning October 1, 1994. In reviewing the Bankruptcy Court's determinations, we apply the same standards as the District Court; that is, legal conclusions are reviewed de novo, factual findings are reviewed for clear error, and exercises of discretion are reviewed for abuse. In re Professional Ins. Mgmt., 285 F.3d 268, 282–83 (3d Cir.2002). The Bankruptcy Court's interpretation of the Local R.R. contract is a question of fact subject to

clear error review. See In re Cendant Corp. Prides Litig., 233 F.3d 188, 193 (3d Cir.2000) (citations omitted). A factual finding is clearly erroneous if, "after reviewing the evidence, the court of appeals is left with a definite and firm conviction that a mistake has been committed." Id. (quoting United States v. Various Articles of Merchandise, 230 F.3d 649, 655 (3d Cir.2000)). The Bankruptcy Court committed no such error here.

The Bankruptcy Court's finding that K & B and Local R.R. entered into an agreement for the weekly production of 75,000 Boxcar Burgers is reasonably supported by the record evidence. At trial, K & B produced the written sales contract dated June 29, 1994 and signed by Mr. Khoury, K & B's president, and Mr. Danzig, Local R.R.'s chairman. That written contract provided that, for a term of two years, K & B was to produce and package Boxcar Burgers for Local R.R. The burger specifications were attached to the contract and made a part thereof. In return, Local R.R. was required to pay K & B $0.696 per three-pack of burgers. Local R.R. was also obligated to place orders for a reasonable amount of burgers at least biweekly. The contract's language is sufficiently specific to indicate a mutual agreement to be bound, and the parties to that contract have throughout these proceedings considered themselves bound.

4. In holding that Mercer County properly terminated the lease, the District Court relied on "newly discovered evidence," specifically a letter by Sydney S. Souter, Esq., a County attorney, to K & B. We determined that the District Court did not have jurisdiction to do so and instructed the Court on remand not to consider the letter.

5. Mercer County filed a cross-appeal, which raised four issues: (1) did the District Court err in affirming the Bankruptcy Court's finding that the County improperly terminated its

lease with K & B; (2) did the Bankruptcy Court abuse its discretion in refusing to consider the County's expert testimony; (3) did the Bankruptcy Court abuse its discretion in refusing to adjourn the trial to allow the County to depose Local R.R.'s chairman; and (4) did the Bankruptcy Court err in concluding that the County failed to prove that K & B could have mitigated its damages? The County's cross-appeal was untimely, and we dismissed that appeal by order dated May 16, 2002.

■ Mercer County—a *non*-party—argues, however, that the contract is illusory because it fails to include, among other things, a quantity term and a start date for performance. The Local R.R. contract does not have a choice of law clause, but it was to be performed in New Jersey. Consequently, New Jersey law is applied in interpreting the contract. *See Valdesa Compania Naviera, S.A. v. Frota Nacional de Petroleiros,* 348 F.2d 33, 38 (3d Cir. 1965); *see also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (1971)(absent a choice of law clause in a contract, the governing law generally is the law of the forum where the contract is executed and performed.) In New Jersey, a contract for the sale of goods is enforceable despite missing terms if the parties intended to make a contract and "there is a reasonably certain basis for giving an appropriate remedy." N.J. STAT. ANN. § 12A:2–204(3); *see Truex v. Ocean Dodge, Inc.,* 219 N.J.Super. 44, 529 A.2d 1017, 1021 (N.J.Super.Ct.App.Div.1987). As the statutory comments explain, this test is not one of certainty, and a court is not required to deduce the exact amount of damages. N.J. STAT. ANN. § 12A:2–204(3), U.C.C. cmt. Open terms may be implied from commercial standards. *Id.; see, e.g.,* N.J. STAT. ANN. §§ 12A:2–305 (price), 12A:2–306 (quantity), 12A:2–307 (place of delivery), 12A:2–309 (time).

A requirements contract is a specific example of an enforceable contract with an open quantity term. N.J. STAT. ANN. § 12A:2–306; *G. Loewus & Co. v. Vischia,* 2 N.J. 54, 65 A.2d 604, 606 (N.J.1949).

> With regard to "requirement" contracts providing for the furnishing of such material as one may need or require, they are, by the weight of authority, held mutual and binding on the parties where, from the nature of the purchaser's business the quantity of the goods needed is subject to a reasonably accurate estimate.

*G. Loewus & Co.,* 65 A.2d at 606. The quantity is that amount of product which the buyer in good faith requires. N.J. STAT. ANN. § 12A:2–306(1) & U.C.C. cmt. 2.

The Bankruptcy Court correctly classified the Local R.R. contract as a requirements contract and implied missing terms based on the testimony of Local R.R.'s and K & B's representatives. Mr. Khoury, K & B's president, testified that he understood the contract requirement to be 75,000 three-packs a week. Similarly, Mr. Homner, Local R.R.'s president, affirmed that 75,000 was the contractual amount and that Local R.R. had sold 300,000 units a week during the six months prior to the contract's execution. Mr. Khoury and Mr. Homner, as well as Mr. Bliziotis, K & B's vice president, also testified that production was set to begin October 1, 1994. Finally, K & B's bookkeeper, Ms. Bliziotis, testified that 75,000 was the correct figure, as confirmed by Local R.R. All of this testimony reasonably supports the Bankruptcy Court's finding that K & B was required to produce and Local R.R. was required to order at least 75,000 units of Boxcar Burgers a week beginning October 1, 1994. As such, the Bankruptcy Court reasonably found the Local R.R. contract enforceable.

Mercer County further attempts to attack this conclusion by asserting, an assertion the District Court found compelling, that K & B was unable to perform under the Local R.R. contract in the fall of 1994.[6]

---

6. The District Court found the Local R.R. contract unenforceable by invoking the requirement of N.J. STAT. ANN. § 12A:2–204(3) that there be "a reasonably certain basis for giving an appropriate remedy" and concluding that "what performance [K & B] would

Specifically, the County alleges that K & B had no utilities, employees, equipment, supplies, or financing with which to produce the Boxcar Burgers. As a factual matter, however, there is sufficient record evidence to support a finding that K & B was able to perform under the contract. K & B had contacted several individuals to provide financing, the James River Corporation to supply packaging, and a company in Flemington to recalibrate the pizza oven. Furthermore, Local R.R. had offered to supply its credit lines to K & B to purchase meat, onions, and buns and to provide equipment, if necessary. Before the contract was even executed, Mr. Homner had inspected K & B facilities to confirm whether K & B could actually produce the burgers. More importantly, as a legal matter, K & B's ability or inability to perform under the Local R R. contract in and around the fall of 1994 is irrelevant to the question of whether the parties executed a valid contract several months earlier. Mercer County's argument fails.

## III. *CONCLUSION*

In sum, the Bankruptcy Court reasonably concluded that the Local R.R. contract was enforceable. Accordingly, that part of the District Court's order of January 5, 2001 holding to the contrary will be vacated and this matter will be remanded to the District Court to reinstate the award to K & B in the amount of $597,849.00.

have fulfilled on the contract is purely speculative." A84. We disagree and conclude, as did the Bankruptcy Court, that the "reasonably certain basis" for the remedy here was the lost profits on 75,000 units per week over

the two year contract period. We note in this record that the County presented utterly no evidence to rebut K & B's evidence of lost profits.